974 F.Supp. 1022 (1997)
Bob HOUSE, Chris Schimmoeller, Kentucky Heartwood, Inc., and Heartwood, Inc., Plaintiffs,
v.
UNITED STATES FOREST SERVICE, U.S. DEPARTMENT OF AGRICULTURE; Donnie Richardson, acting in his official capacity as District Ranger for the Stanton District of the Daniel Boone National Forest; and Robert Joslin, acting in his official capacity as Regional Forester for the Southern Region, U.S. Forest Service, Defendants.
Civil Action No. 96-446.
United States District Court, E.D. Kentucky.
May 29, 1997.
*1023 *1024 Joe F. Childers, Lexington, KY, for plaintiffs.
Jane E. Graham, U.S. Attorney's Office, Lexington, KY, Kelly E. Mofield, Thomas M. Sullivan, U.S. Dept. of Justice, Environment & Natural Resources, Washington, DC, for defendants.
Wayne F. Collier, Shelby C. Kinkead, Jr., Kinkead, Stilz & Alford, Jane Marie Watts, Lexington, KY, Amicus.

OPINION AND ORDER
FORESTER, District Judge.
Before the Court are the parties' cross motions for summary judgment, as well as several procedural motions. All matters have been fully briefed and are ripe for review.

I. INTRODUCTION
This is a civil case brought against the United States Forest Service, U.S. Dept. of Agriculture ("Forest Service"), and employees and agents of the Forest Service in their official and individual capacities, to-wit: Donnie Richardson, District Ranger for Stanton District of Daniel Boone National Forest, and Robert Joslin, Regional Forester for the Southern Region of the Forest Service, for declaratory and injunctive relief to prevent the Forest Service from proceeding with a proposed timber sale on Leatherwood Fork, a tributary of Indian Creek, on Indian Creek, and on Spaas Creek, a tributary of Red River (hereinafter referred to as the "Leatherwood Fork timber sale"). The targeted area is located in the Stanton Ranger District of the Daniel Boone National Forest in Powell and Menifee Counties, in a part of the Daniel Boone National Forest which is close in proximity to the Red River Gorge Geologic Area.
Plaintiffs, Bob House, Chris Schimmoeller, and Kentucky Heartwood, Inc., allege that defendants have violated or failed to adhere to procedures set forth in the Endangered Species Act, 16 U.S.C. § 1531 et seq. ("ESA"), the National Forest Management Act, 16 U.S.C. § 1600 et seq. ("NFMA"), the National Environmental Policy Act, 42 U.S.C. § 4332 et seq. ("NEPA"), and the Administrative Procedure Act, 5 U.S.C. § 702 et seq. ("APA"), by authorizing the Leatherwood Fork timber sale, which plaintiffs submit will harm the Indiana bat, an endangered species.
Plaintiffs seek relief in the form of a permanent injunction levied against the Forest Service which would prohibit it from offering the timber for sale. Each claim is analyzed separately below.

II. FACTUAL BACKGROUND
The Daniel Boone National Forest encompasses close to 690,000 acres. The Leatherwood Fork area encompasses approximately 2,793 acres of the Daniel Boone National Forest. The forest is home to the Indiana bat or Myotis sodalis, an insectivorous nocturnal mammal capable of true flight. Indiana bats are known to be present in several cave systems within a one-mile radius of the Leathenvood Fork timber sale area. The bats feed in the forest on local insect populations in the fall before hibernation and again in the spring upon emerging from hibernation. Additionally, Indiana bats may continue to roost in the caves as well as in tree cavities, beneath exfoliating and/or sloughing bark, and within standing dead trees throughout the summer, and continue to forage locally during this time.[1]
*1025 Management activities of the Daniel Boone National Forest are governed by the Land and Resource Management Plan ("LRMP" or "Forest Plan") which was adopted in 1985 and amended nine times thereafter. [AR, 2A]. The Forest Plan provides standards and guidelines for managing the forest. Of course, the management of the forest is also subject to federal environmental laws, to-wit: the ESA, the NFMA, and the NEPA.
During 1992, the Forest Service began reviewing the possibility of implementing timber harvest on the Leatherwood Fork area. As it currently stands, the Leatherwood Project consists of seven separate cutting units that will harvest commercial saw timber and firewood on approximately 199 acres. [AR, Tab 52 # 2]. The project also entails the construction and/or reconstruction of approximately 2.6 miles of logging roads. Of the seven separate units that comprise the Leatherwood Fork timber sale, three of the units will be logged using a more costly, but less intrusive, method of logging referred to as "cable logging." [AR, Tab 52 2]. The remaining four units will be logged by skidders. Id. All the sale units will be harvested under a modified two-aged shelterwood cut[2]Id. As part of the sales operating provisions, at least three potential Indiana bat roost trees for each acre harvested will be retained, large old beech or sugar maple trees will be retained as den trees wherever possible, and all standing dead trees will be left intact. [AR, Tab 3 8 11]. Additionally, within one mile of the Indiana bat hibernation cave, 3 to 4 live trees around each snag that is at least 16 inches in diameter will be retained, and all shagbark hickories will be retained. Moreover, pursuant to the sales operating provisions, sixteen seasonal wildlife ponds at the ridgetop area of the sale and four waterholes will be constructed. [AR, Tab 52 2]. All 199 acres will be reforested by natural regeneration. Id.
Said project involved an environmental analysis ("EA") under NEPA, NFMA, and the ESA. Additionally, defendants prepared a biological evaluation ("BE") regarding the effects, if any, the proposed project would have on threatened and endangered species, including the endangered Indiana bat. [AR, Tab 36]. Defendants concluded that the timber project was "not likely to adversely affect" any endangered species including the Indiana bat. [AR, Tab 36 20].
Thereafter, on October 31, 1995, as part of the ESA consultation process, the Forest Service delivered the BE to Fish & Wildlife for review. [AR, Tab 37]. On March 11, 1996, Fish & Wildlife concurred in writing with the Forest Service's conclusion that the proposed action was "not likely to adversely affect threatened or endangered species," specifically the Indiana bat. [AR, Tab 50].
In accordance with the Forest Service's procedures, the Forest Service, in early 1996, provided public notice of the proposed timber sale by mailing their EA with a letter identifying *1026 the proposed action to interested persons. 36 C.F.R. § 215.5(b)(2)(i). [AR, Tab 39, 40].[3] Pursuant to 36 C.F.R. §§ 215.6(a), (d), comments on the EA were accepted for a 30-day period. Plaintiffs submitted formal and detailed comments in February 1996, and the same were addressed by the Forest Service. [AR, Tab 51]. On April 10, 1996, District Ranger Richardson approved the Leatherwood Fork timber sale. Hence, the Forest Service issued a Finding of No Significant Impact ("FONSI"), and in compliance with 36 C.F.R. § 215.9, published a Notice of the Decision in a local newspaper. [AR, Tab 53].
On May 24, 1996, plaintiffs Schimmoeller and House filed an administrative appeal with the Department of Agriculture within the time prescribed by 36 C.F.R. § 215.13. [AR, Tab 55]. Regional Forester Joslin denied plaintiffs' appeal on July 23, 1996. [AR, Tab 69]. Hence, plaintiffs have exhausted their administrative remedies.
On May 20, 1997, the Forest Service opened the bidding and received at least one bid. However, the Forest Service agreed to refrain from awarding the bid until the issuance of this Court's opinion and order which disposes of the parties' cross motions for summary judgment and therefore resolves this matter.

III. STANDARD OF REVIEW
In reviewing the decision of defendants to proceed with the Leatherwood Fork timber sale, this Court employs the narrow "arbitrary and capricious" standard of review under the Administrative Procedure Act, 5 U.S.C. § 702 et seq.[4] The Court, limited solely to review what is contained in the administrative record,[5] must determine whether defendants' "decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment," and therefore, was arbitrary and capricious. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823-24, 28 L.Ed.2d 136 (1971); Friends of Fiery Gizzard v. Farmers Home Admin., 61 F.3d 501, 506 (6th Cir.1995).
The Court is not empowered to substitute its judgment for that of the agency. Id. With that rule of law in mind, the Court does not seek to be a "Super Forest Service", however, it must act as a check on administrative decisions. In a recent opinion, the Sixth Circuit eloquently explained the Court's role in cases such as the one at bar:
While it is generally accepted that federal agencies are entitled to a presumption of good faith and regularity in arriving at their decision, that presumption is not irrebuttable. [This Court] would be abdicating [its] Constitutional role were [it] simply to "rubber stamp" this complex agency decision rather than ensuring that such decision is in accord with clear congressional mandates. It is [the Court's] role to see that important legislative purposes are not lost or misdirected in the vast hallways of the federal bureaucracy. Specifically, [the Court] decide whether the Forest Service took a hard look at the relevant factors and reached a decision that was neither arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.
Sierra Club v. Thomas, 105 F.3d 248, 250 (6th Cir.1997), reh'g and suggestion of reh'g en banc denied

*1027 IV. ANALYSIS

A. Whether Defendants Violated The Endangered Species Act, 16 U.S.C. § 1531 et seq.

As indicated by its name, the ESA, enacted in 1973, was passed for the purpose of "provid[ing: (1)] a means whereby the eco-systems upon which endangered species and threatened species depend may be conserved[; and (2)] a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).[6] The key term in the ESA, "conservation", means "to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the Act] are no longer necessary." 16 U.S.C. § 1532(3). One of the foundational premises of the ESA, 16 U.S.C. § 1536(a)(2), provides:
Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section. In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.
Id.[7]
In short, plaintiffs claim that defendants violated the ESA by: (1) failing to place top priority on the conservation of the Indiana bat; (2) failing to enter into formal consultations with Fish & Wildlife prior to approving the timber sale; and (3) sanctioning the timber sale which will "harm" the Indiana bat, thus constituting a "taking".

1. Whether defendants violated the ESA by failing to place top priority on the conservation of the Indiana bat.
The Court does not find persuasive defendants' "balancing interests" argument.[8] Rather, the Court finds that the ESA mandates that defendants place conservation above any of the agency's competing interests. The Supreme Court, in Tennessee Valley Authority v. Hill, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), found that,
[t]he plain intent of Congress in enacting [the ESA] was to halt and reverse the *1028 trend toward species extinction, whatever the cost.... [T]he legislative history undergirding Sec. 7 reveals an explicit congressional decision to require agencies to afford first priority to the declared national policy of saving endangered species. The pointed omission of the type of qualifying language previously included in endangered species legislation reveals a conscious decision by Congress to give endangered species priority over the "primary missions" of federal agencies.... [T]he plain language of the Act, buttressed by its legislative history, shows clearly that Congress viewed the value of endangered species as "incalculable."
Id. at 2297, 437 U.S. at 184-86. See also, 16 U.S.C. § 1531(c)(1) ("all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purpose of this chapter.") Moreover, defendants' Forest Plan provides:
Conservation and recovery of federally endangered, threatened, and proposed species is given top priority in management. All adverse impacts on federally listed species will be avoided except when it is possible to compensate adverse impacts totally through alternatives.
[AR, Tab 2A].
Furthermore, defendants' Forest Plan provides, "all adverse impacts on federally listed species will be avoided except when it is possible to compensate adverse impacts totally through alternatives." [AR, Tab 2A]. Thus the Court concludes that defendants are bound by the ESA and their own Forest Plan, to place the Indiana bat, an endangered species, at the top of its priority list. It will become apparent to the reader of this Opinion and Order that defendants have failed to comply with its affirmative duty by placing the sale of 199 acres worth of trees before the protection of an endangered species[9]

2. Whether the defendants violated the ESA by failing to enter into formal consultations with Fish & Wildlife.

An agency proposing an action must first determine whether the action "may affect" listed species. 16 U.S.C. § 1536; 50 C.F.R. §§ 402.11 and .14. How this determination is made is left up to the agency. If an agency determines that its actions "may affect" a protected species or its habitat, then that agency must enter into consultation with Fish & Wildlife to ensure that the actions are not likely to jeopardize the continued existence of any listed species.[10] 50 C.F.R. § 402.14. There are two forms of consultations: formal and informal.[11] The agency may either enter into formal consultation with Fish & Wildlife or engage in informal consultation to determine whether formal consultation is appropriate or necessary. 50 C.F.R. §§ 402.13, 402.14(a), (b). If during informal consultation, the agency and Fish & Wildlife concur in writing that the proposed action is "not likely to adversely affect" a protected species, then the consultation process is complete and formal consultation is unnecessary. Id. Additionally, if it is agreed that the action will not adversely affect a protected species, then Fish & Wildlife does not have to prepare a biological opinion. On the other hand, if, during informal consultation, the agency determines that it's actions may have an adverse effect on a protected species, then the agency must request initiation of formal consultation with Fish & Wildlife. Moreover, if formal consultation is required, then a biological opinion by Fish & *1029 Wildlife is required to advise the agency whether jeopardy is likely to occur and, if so, whether reasonable and prudent alternatives exist to avoid a "jeopardy" situation.
In the case at hand, the Forest Service elected to prepare a biological evaluation ("BE") regarding the effects, if any, the proposed project would have on threatened and endangered species, including the Indiana bat. [AR, Tab 36]. The Forest Service concluded in its BE that the Leatherwood Fork timber sale was "not likely to adversely affect" the protected Indiana bat or its habitat. [AR, Tab 36 20]. As discussed above, the Forest Service entered into informal consultations with Fish & Wildlife. [AR, Tab 37]. Fish & Wildlife concurred in writing with the Forest Service's conclusion that the Leatherwood Fork timber sale would not adversely affect the Indiana bat. Consequently, the Forest Service and Fish & Wildlife did not enter into formal consultations and, therefore, Fish & Wildlife never rendered a biological opinion to advise the Forest Service whether jeopardy to the Indiana bat is likely to occur and, if so, whether reasonable and prudent alternatives exist to avoid a "jeopardy" situation.
In light of the substance of Forest Service's documents, to-wit: the meat of the BE and EA, which, as discussed below, indicate that the chosen alternative for harvesting will in fact adversely affect the Indiana bat, this Court finds that the Forest Service should have entered into formal consultations with Fish & Wildlife and a biological opinion should have been prepared by the latter. The timber sale shall be enjoined until such time as the impact on the Indiana bat is properly assessed and said assessment concludes that there will be no adverse affect on the endangered species.

3. Whether the timber sale will "harm" the Indiana bat and thus constitute a taking
As recognized by Tennessee Valley Authority v. Hill, 437 U.S. 153, 178-80, 98 S.Ct. 2279, 2294, 57 L.Ed.2d 117 (1978), the ESA prohibits anyone from "taking" endangered species. 16 U.S.C. § 1538(a)(1)(B)("[I]t is unlawful for any person subject to the jurisdiction of the United States to take any such species within the United States or the territorial sea of the United States.") The ESA provides that "take" includes to harass or harm endangered species.[12] State of California v. Watt, 520 F.Supp. 1359 (C.D.Cal.1981), aff'd in part and rev'd on other grounds, 683 F.2d 1253 (9th Cir.), rev'd in part on other grounds, 464 U.S. 312, 104 S.Ct. 656, 78 L.Ed.2d 496. Via regulation, "harm" as used in the ESA is defined as follows:
Harm in the definition of "take" in the Act means an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavior patterns, including breeding, feeding, or sheltering.
50 C.F.R. § 17.3 (1994). "Harm" must be demonstrated by actual evidence, which may be in the form of scientific studies. American Bald Eagle v. Bhatti, 9 F.3d 163, 165 (1st Cir.1993) ("the proper standard for establishing a taking under the ESA, far from being a numerical probability of harm, has been unequivocally defined as a showing of `actual harm.'") However, in order for the Court to issue an injunction, the ESA does not require that the harm to the endangered species have already occurred. Marbled Murrelet v. Babbitt, 83 F.3d 1060, cert. denied by Pacific Lumber Co. v. Marbled Murrelet, ___ U.S. ____, 117 S.Ct. 942, 136 L.Ed.2d 831 (Feb. 18, 1997) (held a reasonably certain threat of imminent harm to a protected species is sufficient for issuance of an injunction under the ESA). "Harass", another synonym for "take" under the ESA, is defined as "an intentional or negligent act which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering". 50 C.F.R. § 17.3. See American Bald Eagle v. Bhatti, 9 F.3d 163, 167, fn. 5 (1st Cir.1993)(to prove a "significant risk of harm" under the definition of "harass", which may constitute "take", requires a lower degree of certainty of harm than under the definition of "harm").
*1030 Plaintiffs argue that the destruction of the Indiana bat's summer habitat will harm the endangered species and would thus be a violation of the ESA, as such action constitutes a taking. Plaintiffs assert that the harm to the habitat would occur in the form of the destruction of the forest canopy which will: (1) destroy the Indiana bats' foraging habitat; and (2) destroy potential roosts.
Defendants' EA nor BE reveal what the existing closure of the canopy is. However, the defendants do project that the timber sale will reduce the canopy closure in portions of stands 3 and 4[13], which are less than one mile from the Indiana bats' hibemacula, to about 30%, i.e., 30% of the canopy will have trees and 70% will be open. The remaining cutting unit stands, 1, 2, 5, 6, and 7, will be afforded less than a 30% canopy. [AR, Tab 36 10].
Defendants' own BE Report recognizes the importance of the Leatherwood forest for foraging purposes.[14] Further, defendants' own EA notes the importance of the forest areas that surround the caves in the Leather-wood area for roosting.[15] However, the contention between the parties is not that the forest surrounding the hibernacula is vitally important to the Indiana bat. The parties dispute whether or not the timber sale will adversely affect the Indiana bat. This dispute arises in short from defendants' defective analysis of the effect that the reduction in the canopy would have on the Indiana bat. Defendants misconstrued scientific evidence, and thus their conclusion that the 30% canopy would not adversely affect the Indiana bat is flawed. In their EA, defendants stated that, "Recent research (Romme, et al. 1995) suggests that ideal foraging habitat for Indiana bats is forested or semi-forested habitat with large trees, a relatively open understory, and canopy closure of 30% or more." [AR, Tab 38 47].[16]
Contrary to defendants' capsule summary of scientific information in their memoranda, the Romme study states, "Optimal habitat is *1031 assumed to be between 50% and 70% [for foraging]," [AR, Tab. 38 GG 041] and "Sites with between 60% and 80% canopy cover provide optimal conditions [for roosting]. ...." [AR, Tab 38 GG 035].[17] Also contradictory to defendants' assertions, scientific data in the administrative record provides,

M. sodalis is generally believed to require forest habitat with relatively complete canopy closure (Humphrey et al. 1977, Brack 1983). Capture data collected from 33 sites in Indiana (3D/ESI 1993) indicate that M. sodalis preferentially utilizes areas that include forest patches with relatively complete canopy closure (62.2 +/7.1%). [AR, Tab 38 GG 037].
Not only does the objective scientific evidence in the administrative record support plaintiffs' position that the timber sale will adversely affect the Indiana bat's foraging habitat, defendants EA and BE admit that the project, as carried out under modified alternative C, will lower the quality of the foraging habitat. Defendants' BE provides:
Under either alternative, the amount of available foraging habitat of IB may be adversely affected if indeed the bats make more than casual use of the units to be cut. Because IB are known from nearby caves (within one mile) the probability that they are using Leatherwood RAU as foraging habitat (at least during the period in the fall immediately prior to hibernation) is high. It is also probable that summer use of the area by IB (including possible maternity colonies) is occurring although this has not yet been documented. [AR, Tab 36 15][18]
Cutting timber in the units in Alternatives B or C (modified C being the chosen alternative) would affect some foraging habitat for Indiana bats. The risk of adverse effects would be greatest in the cutting units that lie within or near a one-mile radius from the large Indiana bat hibernacula. [AR, Tab 38 52]
The Court notes that defendants chose not to select alternative D (removing selectively cut trees by helicopter from steep slopes), which would have had less of an adverse impact on the bat's foraging habitat for vegetational and economical reasons.[19]
In light of the above, the Court concludes that the Indiana bat's foraging habitat may *1032 be adversely affected by the Leatherwood Fork timber sale and thus may constitute a "taking" of the Indiana bat, as the timber sale may harass and/or harm the Indiana bat in violation of the ESA.
With respect to the Indiana bat's roosting habitat, defendants argue that in fact the Leatherwood Fork sale will not harm the Indiana bat's roosting habitat for several reasons. First, defendants have a no-cut provision from March to November, the time-frame in which it is most likely that the Indiana bats are using the project area for roosting, and thus defendants conclude that Indiana bats will not be harmed, as they will not be present when the trees are being cut. Additionally, defendants submit that because of a condition on the timber sale that harvesters will not remove dead trees, all standing dead trees (snags) will be retained [AR, Tab 38 15,52], and thus potential roost sites will not be harmed. Moreover, defendants submit that opening up some stands will improve access to live hollow trees, snags, and shagbark hickories in the harvesting area, thereby increasing the suitability of the existing habitat for Indiana bats [AR, Tab 38].
According to the evidence in the record, "Sites with between 60% and 80% canopy cover provide optimal conditions [for roosting] ...." [AR, Tab 38 GG 035]. Additionally, there is evidence in the record that Indiana bats may roost in the summer within the cavities of live trees and beneath the exfoliating bark of living shagbark hickories, two potential roosts only one of which is protected (within one mile of the Indiana bat's hibernation caves) by the provisions of the sale agreement. Thus, the Court concludes that despite the defendants' attempt to diminish the adverse effects that the timber sale may have on the Indiana bat, the sale may harass and/or harm the roosting habitat of the Indiana bat, and thus may constitute a "taking" of the endangered species in violation of the ESA.
In conclusion, because the Court has found that defendants violated the ESA by failing to place top priority on the conservation of the Indiana bat, by failing to enter into formal consultations with Fish & Wildlife, and by sanctioning the timber sale which may harm the Indiana bat, the Court shall enjoin defendants from awarding the timber sale contract pending full compliance with the ESA, specifically formal consultations with Fish & Wildlife resulting in a biological opinion rendered by Fish & Wildlife. When balanced against the potential extinction of a species, defendants' burden is negligible.

B. Whether Defendants Violated The National Forest Management Act, 16 U.S.C. § 1600 et seq.[20]
The Multiple-Use Sustained-Yield Act ("Multiple-Use Act") of 1960 provides that the Forest Service manage the National Forests for outdoor recreation, range, timber, watershed, and wildlife and fish purposes under the balance the agency deems will "best meet the needs of the American people [and] mak[e] the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions" 16 U.S.C. § 531(a). Moreover, the Multiple-Use Act provides the Forest Service shall use "some land ... for less than all of the resources [and that the Forest Service will promote] harmonious and coordinated management of the various resources, each with the other, without impairment of the productivity of the land, with consideration being given to the relative values of the various resources and not necessarily the combination of uses that will give the greatest dollar return or the greatest unit output." Id. Furthermore, the Multiple-Use Act provides *1033 that the Forest Service shall manage the National Forests so as to provide a sustained yield of various renewable resources of the national forest without impairment of the productivity of the land resources. 16 U.S.C. §§528, 531(b). The principles, goals, and mandates of the Multiple-Use Act are incorporated in the National Forest Management Act, promulgated in 1976, which is set forth in 16 U.S.C. § 1600 et seq. 16 U.S.C. § 1604(e); 36 C.F.R. § 219.1(a)(1).
The NFMA establishes a statutory framework for the National Forest System and directs the development of Land and Resource Management Plans. 16 U.S.C. § 1604(a)("As part of the Program provided for by section 4 of this Act, the Secretary of Agriculture shall develop, maintain, and, as appropriate, revise land and resource management plans (LRMPs) for units to the National Forest System, coordinated with the land and resource management planning processes of State and local governments and other Federal agencies.")
The NFMA was enacted as a direct result of congressional concern for Forest Service clear cutting practices and the dominant role timber production has historically played in Forest Service Policies. Congress was concerned that, if left to its own essentially unbridled devices, the Forest Service would manage the national forest as mere monocultural "tree farms." Procedurally, the Act requires the Forest Service to develop Land and Resource Management Plans for the national forests. This formal planning process was designed to curtail agency discretion and to ensure forest preservation and productivity.
Sierra Club v. Thomas, 105 F.3d 248, 249-50 (6th Cir.1997), reh'g and suggestion for reh'g en banc denied. The statute directs the Secretary of the Department of Agriculture to use a systematic, interdisciplinary approach to forest planning so as to achieve integrated consideration of physical, biological, economic, and other sciences. 16 U.S.C. § 1604(b). The NFMA requires the Forest Service to prepare "one integrated plan for each unit of the National Forest System, incorporating in one document or one set of documents, available to the public at convenient locations, all of the features required by this section." 16 U.S.C. § 1604(f)(1).
Additionally, the NFMA provides for public participation in this forest planning process. 16 U.S.C. § 1604(d).[21] The NFMA requires that the Secretary of Agriculture "promulgate regulations under the principles of the Multiple-Use Sustained-Yield Act of 1960, that set out the process for the development and revision of the land management plans, and the guidelines and standards prescribed by this section." 16 U.S.C. § 1600(g). The statute further provides that said "guidelines for land management plans developed to achieve the goals of the Program which insure research on and (based on continuous monitoring and assessment in the field) evaluation of the effects of each management system to the end that it will not produce substantial and permanent impairment of the productivity of the land."
Under the NFMA, LRMPs must be periodically revised and may be "amended in any manner whatsoever." 16 U.S.C. §§ 1604(f)(4) and (f)(5).[22] Implementing regulations state:

*1034 Amendment.
The Forest Supervisor may amend the forest plan. Based on an analysis of the objectives, guidelines, and other contents of the forest plan, the Forest Supervisor shall determine whether a proposed amendment would result in a significant change in the plan. If the change resulting from the proposed amendment is determined to be significant, the Forest Supervisor shall follow me same procedure as that required for development and approval of a forest plan. If the change resulting from the amendment is determined not to be significant of the purposes of the planning process, the Forest Supervisor may implement the amendment following appropriate public notification and satisfactory completion of NEPA procedures.
36 C.F.R. § 219.10(f).
Plaintiffs argue that defendants, by approving the timber sale, violated the NFMA by relying upon three policies which have not been formally merged into the ten-year Forest Plan for the Daniel Boone National Forest, as the three policies have not been subjected to public comment and scrutiny. In short, plaintiffs submit that the Forest Service has four Forest-wide Policies, to-wit: (1) The Proposed Strategy of the Management of Roosting and Foraging Habitat for the Indiana bat [AR, Tab 38 X]; (2) Daniel Boone National Forest's Two-Age Shelterwood Policy [AR, Tab 38 OO]; (3) the Cliffline Management Policy [AR, Tab 38 NN]; (4) the Forest Service's current ten year "Forest Plan". Plaintiffs argue that defendants are prohibited from having four separate plans. Plaintiffs also contend that in actuality, the first three named policies are actually "amendments" to defendants' standing Forest Plan, and that if it is determined that said amendments are "significant", then defendants did not jump through the public notice hoops as required by the NFMA.[23]
Defendants counter that the three alleged "additions" to the established Forest Plan merely clarify the standards and guidelines which are already incorporated in the Forest Plan which address the use of various silvicultural practices for regeneration as well as the diversity of habitats and the protection and maintenance of habitat for all bat species. [AR Tab 2A]. As such, defendants argue that no public participation in NEPA or NFMA is necessary, since the three policies are not amendments. 36 C.F.R. § 219.10(f).
The Court finds that the three policies at bar do more than merely clarify the standards and guidelines within the Forest Plan. Rather, the Court finds that the three policies provide additional guidelines, and as such are subject to the notice and comment procedures set forth in NFMA and NEPA. Accordingly, the Court finds that these policies may not be implemented until the Forest Plan has been properly amended to include the same.

C. Whether Defendants Violated The National Environmental Policy Act, 42 U.S.C. § 4332 et seq.

The National Environmental Policy Act ("NEPA") was promulgated, in part, to focus the attention of the government and the public on a proposed action, so that the consequences of the action can be studied before it is implemented. Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 371, 109 S.Ct. 1851, 1858, 104 L.Ed.2d 377 (1989); Michigan v. United States, 994 F.2d 1197, 1199 (6th Cir.1993)(the purpose of the Act is to ensure that federal agencies are aware of the environmental impact of their actions). NEPA applies only to "major federal actions significantly affecting the quality of human environment." 42 U.S.C. § 4332(2)(C). NEPA created the Council on Environmental Quality ("The Council") to provide guidance *1035 on agency compliance with NEPA. 42 U.S.C. § 4341-4347.
In order to comply with NEPA, before an agency may undertake a "major federal action [which would] significantly affect[] the quality of the human environment," the agency must prepare an Environmental Impact Statement ("EIS"). 42 U.S.C. § 4332(2)(C). However, despite this mandate, if after a careful examination through an Environmental Assessment ("EA"), it is determined that the action would not be "significant", then an EIS is not necessary. 40 C.F.R. § 1507.3(b)(2). See also, Forest Service Handbook 1909.15, Chapter 40. Thus, at the conclusion of the EA,[24] the Forest Service prepares either a Finding of Significant Impact, a Finding of No Significant Impact ("FONSI"), 40 C.F.R. § 1508.13, or an EIS, 40 C.F.R. § 1508.11. Throughout this process, "all environmental information [collected must be made] available to public officials and citizens before decisions are made and before actions are taken. [Said] information must be of high quality. [Furthermore] accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." 40 C.F.R. § 1500.1.
Plaintiffs argue that defendants violated NEPA by failing to prepare an EIS for the Leatherwood Fork timber sale, which plaintiffs contend constitutes a major Federal action significantly affecting the quality of the human environment. 42 U.S.C. § 4332(C). As stated by the Ninth Circuit Court of Appeals,
The standard for determining whether the implementation of a proposal would significantly affect the quality of the human environment is whether "the plaintiff has alleged facts which, if true, show that the proposed project may significantly degrade some human environmental factor." A determination that significant effects on the human environment will in fact occur is not essential. If substantial questions are raised whether a project may have a significant effect upon the human environment, an EIS must be prepared.
Foundation for North American Wild Sheep v. U.S. Dept. of Agriculture, 681 F.2d 1172, 1177-78 (9th Cir.1982) (citations omitted). In determining if an action may have significant effects, the CEQ NEPA Regulations are helpful. The regulations require that the defendants consider the "severity of impact" on the following relevant items:
...
(3) Unique characteristics of the geologic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.
(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.
(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.
...
(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulative significant impact on the environment ...
(8) The degree to which the action may adversely affect district, sites, highways, structures, or objects listed in or eligible for listing on the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

*1036 (9) The degree to which the action may adversely affect an endangered or threatened species or it's habitat that has been determined to be critical under the Endangered Species Act of 1973.
(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed on the protection of the environment.
40 C.F.R. § 1508.27.
In determining whether or not the acting agency properly decided not to conduct an EIS, the Court may not "substitute its judgment of the environmental impact for the judgment of the agency, once the agency has adequately studied the issue." Kelley v. Selin, 42 F.3d 1501, 1518-1519 (6th Cir.1995), cert. denied, 515 U.S. 1159, 115 S.Ct. 2611, 132 L.Ed.2d 855 (1995) (under NEPA, landowners challenged Nuclear Regulator Commission's approval of new casks for dry storage of nuclear waste and use of casks at a particular power plant; court held that agency did not violate NEPA by conducting a tiered analysis before approving the new cask rather than by preparing an EIS). Hence, the Court is limited to examining whether the Forest Service took a "hard look" at the environmental consequences of the Leatherwood Fork Timber Sale prior to issuing the FONSI. Id.; Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 373-74, 109 S.Ct. 1851, 1859, 104 L.Ed.2d 377 (1989). If the Forest Service took the requisite "hard look" at the possible environmental impacts, absent a showing of arbitrary action, its decision should not be overturned. Kleppe v. Sierra Club, 427 U.S. 390, 412, 96 S.Ct. 2718, 2731, 49 L.Ed.2d 576 (1976).
Given that the EA and BE suggest that the sale will harm the Indiana bat, an endangered species, and that the Leatherwood Fork timber project is located near Red River Gorge, a significant geologic site, the Court finds that an EIS should have been prepared, and as it was not, defendants violated the NEPA.

V. SUMMARY OF FINDINGS
In light of the analysis set forth above, the Court finds that defendants did not afford the Indiana bat top priority as required by the ESA and that defendants' decision to go forward with the Leatherwood Fork timber sale at this point in time, without consulting formally with Fish & Wildlife and in the absence of a biological opinion rendered by Fish & Wildlife, was arbitrary and capricious.
Furthermore, the Court concludes that defendants may not employ the (1) Proposed Strategy of the Management of Roosting and Foraging Habitat for the Indiana Bat; (2) the Daniel Boone National Forest's Two-Age Shelterwood Policy; and (3) the Cliffline Management Policy, as named policies must first be properly amended to the Forest Service's current plan.
Finally, the Court concludes that in issuing a FONSI, defendants failed to take a "hard look" at the scientific evidence before them. Thus, the Court finds that an EIS should be prepared before going forward with the timber sale.

VI. CONCLUSION
For the foregoing reasons, the Court, being otherwise sufficiently advised, HEREBY ORDERS THAT:
(1) plaintiffs' motion for modification of the schedule for cross motions for summary judgment [docket entry 13] IS DENIED AS MOOT;
(2) plaintiffs' motion to exceed page limitation in their memorandum in support of their motion for summary judgment [docket entry 16] IS GRANTED;
(3) plaintiffs' motion for summary judgment [docket entry 15] IS GRANTED, and summary judgment will be entered contemporaneously with this Opinion and Order in favor of Bob House, Chris Schimmoeller, Kentucky Heartwood, Inc., and Heartwood, Inc.;
(4) the motion of movants Kentuckians for the Commonwealth, Inc., Buckley Hills Audubon Society, Inc., Louisville Audubon Society, Inc., Paddlewheel Alliance, Inc., Daviess County Audubon Society, Help Alert Western Kentucky, Inc., Appalachia-Science in the Public Interest, Inc., Fellowship of Reconciliation, Rockcastle River Rebirth, Concerned Citizens Coalition, Greenthumb, The Wildlife Connection, Boone Karst Conservation Task Force, Ygdrasil Institute, Fionna *1037 Earth First!, Students to Save Robinson Forest, Coalition for Health Concerns, Inc., John A. Patterson, M.D., Melinda Erickson, Blair Ferrell, Johanna Camenisch, Don Smith, Virginians for Wilderness, Inc., Earth Tools and Goods, Earth Care, Wild Earth, Inc., Affinity, Inc., Buckeye Forest Council, Inc., Rabun County Coalition, Inc., Regional Association of Concerned Environmentalists, Inc., Newton County Wildlife Association, Inc., Vince Donofrio, Rodger Clarke, R.N., James Keown, Travis Thickstun, for leave to join as amici curiae [docket entry 19] IS GRANTED;
(5) defendants' motion to extend time to file a reply to plaintiffs' memorandum in opposition to defendants' motion for summary judgment [docket entry 25] IS GRANTED;
(6) defendants' motion for leave to file an over-length memorandum in reply to plaintiffs' memorandum in opposition to defendants' motion for summary judgment [docket entry 27] IS GRANTED;
(7) defendants' motion for summary judgment [docket entry 21] IS DENIED;
(8) plaintiffs' motion for leave to file an amended complaint [docket entry 26] IS DENIED;
(9) plaintiffs' motion for oral argument [docket entry 31] IS DENIED AS MOOT; and
(10) the pretrial conference and the jury trial are SET ASIDE.

SUMMARY JUDGMENT
In accordance with the Opinion and Order entered contemporaneously with this summary judgment, the Court hereby ORDERS AND ADJUDGES that:
(1) summary judgment is entered in favor of the plaintiffs, Bob House, Chris Schimmoeller, and Kentucky Heartwood, Inc.;
(2) this matter is DISMISSED WITH PREJUDICE;
(3) this judgment is final and appealable, and no just cause for delay exists; and
(4) this matter is STRICKEN from the active docket.
NOTES
[1] The Indiana bat was listed as an endangered species on March 11, 1967. Between 1960 and 1975, the bat's population decreased by 28%. In 1983, subsequent in time to the passage of the ESA, the U.S. Fish and Wildlife Service ("Fish & Wildlife") issued a recovery plan for the Indiana bat. Fish & Wildlife then designated seven (7) "Priority 1 hibernacula" where 85% of the Indiana bats currently hibernate. Despite the recovery plan's goal of halting the decline of the Indiana bat, the bat's population has continued to fall. Between 1960 and 1987 there was a 55% population decline at Priority 1 hibemacula, and a generally similar decline at Priority 2 hibernacula. [AR, Tab 38 GG 008]. According to the defendants' Indiana Bat Summer Habitat Management Strategy, "[i]f the present rate of decline continues, the Indiana Bat Recovery Team projects that the species will be extirpated from Priority 1 caves, and perhaps become extinct, by the year 2040." [AR, Tab 38 X 03, 04].

The authority on the Indiana bat is a study entitled, "Literature Summary and Habitat Suitability Index Model" (1995), prepared by Romme et al. under contract with Fish & Wildlife and the Indiana Department of Natural Resources ("Romme") for the purposes of "aid[ing] in environmental review of actions that may affect the [Indiana bat], provid[ing] a tool to measure the effectiveness of habitat mitigation efforts, and assist[ing] land managers developing a `desired future condition' where the [Indiana bat] is a priority consideration." [AR, Tab 38 GG 008].
[2] There are two types of logging: even-aged management and uneven-aged management. Even-aged management consists of clear cutting (removal of all the trees) and its variants. The Leatherwood Fork timber sale is scheduled to use the even-aged cutting method of deferred shelterwood (removal of almost all the trees). The other two forms of even-aged management are clear cutting and seed tree cutting. Unevenaged management consists of individual tree selection where only 10-20% of the individual trees are removed from the forest or group selection where 10-20% of the trees are removed in small groups.
[3] In their EA, defendants concluded:

No known threatened, endangered or sensitive species will therefore be adversely affected by these actions. Extensive field surveys were conducted, communication and concurrence from the United States Fish and Wildlife Service received, and a biological evaluation (BE) has been prepared as part of the analysis of potential effects to threatened, endangered or sensitive species form the alternatives. The selected alternative is not likely to adversely affect any listed or sensitive species, as detailed in the environmental assessment and biological evaluation.
[AR, Tab 52 05].
[4] Specifically, the Court must determine whether the agency acted in a manner that was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).
[5] Florida Power and Light Co. v. Lorion, 470 U.S. 729, 743, 105 S.Ct. 1598, 1606-07, 84 L.Ed.2d 643 (1985)(reviewing courts are limited to the administrative record). For this reason, the Court will not consider the documents that plaintiffs submitted to the Court which are not a part of the administrative record.
[6] The Secretary of the Interior has the authority to designate species as endangered or threatened. 6 U.S.C. § 1533(a). As stated previously, the Indiana bat is a listed endangered species.
[7] To assist agencies in complying with its duty not to jeopardize the continued existence of endangered species or said species habitat, the ESA and its implementing regulations set out a detailed consultation process designed to provide agencies with expert advice in determining the biological impacts of their proposed activities. 16 U.S.C. § 1536(b). See e.g., 50 C.F.R. § 402, et seq....
[8] Defendants argue that the ESA grants defendants some discretion among conservation measures for the benefit of listed species and that the case law behind the ESA provides that the defendants may balance their obligations to conserve with competing agency interests. For these premises, defendants cite the following distinguishable cases: Pyramid Lake Paiute Tribe v. US. Dept. of Navy, 898 F.2d 1410, 1417-18 (9th Cir.1990) (found no difference in the duties imposed by the ESA on agencies under the umbrella of the Department of the Interior and "Non-Interior" agencies; upheld the Department of the Navy's reliance on opinions of Fish and Wildlife Service in executing its program as it was not arbitrary or capricious because the program did not violate the ESA, as it would not "take" an endangered species); Carson-Truckee Water Conservancy Dist. v. Clark, 741 F.2d 257 (9th Cir.1984), cert. denied by Nevada v. Hodel, 470 U.S. 1083, 105 S.Ct. 1842, 85 L.Ed.2d 141 (1985) (upheld the Secretary of the Interior's decision to give priority to an endangered species of fish until such time as they no longer needed the protection of the ESA because such decision was in accordance with the ESA); National Wildlife Fed. v. National Park Service, 669 F.Supp. 384 (D.Wyo.1987) (held continuing operation of campground under interim management plan pending results of EIS with regard to effects on endangered species of grizzly bear did not violate ESA). While the Court agrees that defendants have some discretionary powers as to the methods of conservation it desires to implement, it does not agree with defendants' assertion that defendants may balance competing agency interests with the conservation of an endangered species, as this flies smack in the face of the Supreme Court's holding in Tennessee Valley Authority v. Hill, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978).
[9] Although not considered by the Court in reaching its decision, the Court notes that the injunction of the Leatherwood Fork timber sale is not of the same (or even remotely close) magnitude as the injunction relating to the snail darter and the multi-million dollar Tellico Dam project or the injunction prohibiting tree harvesting projects in our western states which rely, to a great extent, on the sale of timber for economic prosperity.
[10] If the agency determines that its proposed actions will have "no effect" on protected species, then consultation is not required unless the director of Fish & Wildlife specifically requests consultation with the agency. 50 C.F.R. § 402.14(a).
[11] The purpose of the consultation requirements of the ESA is to allow an agency to avail itself of "the expertise of Fish & Wildlife in assessing the impact of the proposed project and the feasibility of adopting reasonable alternatives." Lone Rock Timber Co. v. United States Department of Interior, 842 F.Supp. 433, 440 (D.Or.1994).
[12] "The term `take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect or to attempt to engage in such conduct." 16 U.S.C. § 1532(19).
[13] A. "stand" is a grouping of trees.
[14] Defendants' BE explains:

Indiana bats are known from several cave systems within one-mile radius of the Leatherwood RAU. (Name redacted) and (name redacted) both gated, have good populations of these rare bats. Although the caves themselves are very important as hibernating quarters for the bats, the forest areas that surround the caves are also very important. After arriving in the vicinity of the caves in the fall of the year, Indiana bats feed heavily on local insect populations in order to build up the fat reserves that will sustain them through the winter months. Although some of these bats may roost in the caves by day in the fall, there is good recent evidence that many of them use tree roots (snags, hollow trees, and shagbark hickories) at this time and do not actually move into the caves until cold weather sets (Kiser and MacGregor, pers. common.). There may also be a flurry of local feeding in early spring as the bats begin to emerge from hibernation. Small populations of Indiana bats may continue to roost in the caves throughout the summer (see Barbour and Davis, 1974), foraging locally during this time.
[AR, Tab 36 04]
[15] The defendants' EA regarding the Leatherwood Fork timber sale provides:

Good populations of Indiana bats occur in an adjacent watershed in two caves that have been gated by the Forest Service for the protection of the rare bats. Although the caves themselves are very important as hibernating quarters for the bats, the forest areas that surround the caves are also very important.
...
Although much of the literature indicates that Indiana bats migrate northward in the spring to maternity sites in Ohio, Indiana, and Michigan, recent captures [in 1994 and 1995] of lactating female Indiana bats over woodland ponds at two sites on the Morehead Ranger District [just north and east of Leatherwood] have demonstrated that summer maternity colonies are present on the Daniel Boone National Forest as well. In general, summer roosts for Indiana bats, including maternity roosts, have been found in the following habitats: 1) within tree cavities [in hollow limbs or boles]; 2) beneath the exfoliating bark of living shagbark hickories; 3) beneath the sloughing bark of dead or severely damaged trees; and 4) within standing dead trees [snags].
...
All of this suggests the rather strong possibility that local Indiana bat populations (especially those which hibernate in the two gated caves nearby) regularly use the upland habitats within ... Leatherwood.
[16] Interestingly and contradictory to defendants' assertions in their EA, defendants' commentary found in their "Indiana Bat Management Strategy" plan provides:

Foraging habitat consist mostly of upland and/or riparian woodlands and borders. Indiana bats prefer to forage within the upper canopy layers (Humphrey et al, 1977) in forests where the degree of overstory canopy ranges from 50% to 70% (Romme et al, 1995). Suitability drops slightly as canopy closure increases from 70% to 100% and drops somewhat more sharply as it declines below 50% (Romme et al, 1995). Some foraging also takes place over clearings with early successional vegetation, along forested borders of agriculture land, and along strips of trees extending into more open habitats. [AR, Tab 38 × 03, "Indiana Bat Management Strategy" at 3].
[17] On a scale of 0-1, with one being the best habitat, 30% canopy closure is rated at 0.2 for roosting, and for foraging a 30% canopy closure is rated at 0.5. [(Romme 1995) AR, Tab 38 GG 037,042].
[18] Defendants attempt to skirt the damage to the foraging habitat by alleging that a large percentage of the roosting sites will be retained.

Although overall foraging habitat for Indiana bats will be decreased, this will in part be counterbalanced since a large percentage of potential roosting and maternity sites for these bats will be retained in the form of live hollow trees, live shagbark hickories, and hardwood snags in all cutting units. [AR, Tab 36 20]
The Court finds this "set off" argument irrational in light of the scientific evidence in the record.
[19] The defendants' EA and BE provides:

Foraging habitat of Indiana bats has the potential to be significantly less impacted by Alternative D than by Alternatives B and C. Since the units harvested by single-tree selection would retain a residual basal area about 55 to 65 BA, these units would remain suitable as foraging habitat during and immediately after harvest as well as for the foreseeable future. The small group selection cuts on the ridgetop would create small clearings within the cutting units on Hatton Ridge. Since the small clearings would be surrounded by forest, it is likely that these units would also remain suitable as foraging habitat. [AR, Tab 38 55;36 19].
Defendants explained in their Decisions Notice that "this alternative was not selected primarily because of vegetational and economical effects as disclosed in the environmental analysis." [AR, Tab 52 03]. The economic rationale is unacceptable in light of the Supreme Court's holding in Tennessee Valley Authority v. Hill, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978).
One might dispute the applicability of these examples to the Tellico Dam by saying that in this case the burden on the public through the loss of millions of unrecoverable dollars would greatly outweigh the loss of the snail darter. But neither the Endangered Species Act nor Art. Ill of the Constitution provides federal courts with authority to make such fine utilitarian calculations. On the contrary, the plain language of the Act, buttressed by its legislative history, shows clearly that Congress viewed the value of endangered species as "incalculable." Quiet obviously, it would be difficult for a court to balance the loss of a sum certain  even $100 million  against a congressionally declared "incalculable" value, even assuming we had the power to engage in such a weighing process, which we emphatically do not.
Id. at 186-88, 98 S.Ct. at 2298.
[20] In their tendered amended complaint, plaintiffs submit that in light of the Sixth Circuit Court of Appeals recent ruling in Sierra Club v. Thomas, 105 F.3d 248 (6th Cir.1997), reh'g and suggestion for reh'g en banc denied (April 7, 1997), defendants' Decision Notice should be declared arbitrary and capricious because the plan is biased toward clear cutting, a form of even-age management, which the Sixth Circuit held should be the exception rather than the norm according to the NFMA.
[21] 16 U.S.C. § 1604(d) provides:

Public participation in management plans; availability of plans; public meetings.
The Secretary shall provide for public participation in the development, review, and revision of land management plans, including, but not limited to, making the plans or revisions available to the public at convenient locations in the vicinity of the affected unit for a period of at least three months before final adoption, during which period the Secretary shall publicize and hold public meetings or comparable processes at locations that foster public participation in the review of such plans or revisions.
[22] The plans are amended pursuant to 16 U.S.C. §§ 1604(f)(4) and (5), which provide: Plans developed in accordance with this section shall

(4) be amended in any manner whatsoever after final adoption after public notice, and if such amendment would result in a significant change in such plan, in accordance with provisions of subsections (e) and (f) of this section and public involvement comparable to that required by subsection (d) of this section; and
(5) be revised (A) from time to time when the Secretary finds conditions in a unit have significantly changed, but at least every fifteen years, and (B) in accordance with the provision of subsections (e) and (f) of this section and public involvement comparable to that required by subsection (d) of this section.
16 U.S.C. 1604(f)(4) and (5).
[23] Defendants are required to provide public participation before adopting new policies. See 16 U.S.C. § 1604(d) ("The Secretary shall provide public participation in the development, review, and revision of land management plans...."). 40 C.F.R. § 1500.1(b) provides, "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken ... [as] ... public scrutiny [is] essential to implementing NEPA." See also, Sierra Club v. Marita, 46 F.3d 606, 608 (7th Cir. 1995) (held "the Forest Service must develop its management plans in conjunction with ... extensive public participation and comment ...").
[24] "Environmental Assessment":

(a) Means a concise public document for which a Federal agency is responsible that serves to:
(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.
(2) Aid an agency's compliance with the Act when no environmental impact statement is necessary.
(3) Facilitate preparation of a statement when one is necessary.
(b) Shall include brief discussion of the need for the proposal, of alternatives, ... of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.
40 C.F.R. § 1508.9.