**BENSMAN, et al., Plaintiffs,**

v.

**UNITED STATES FOREST SERVICE, et al., Defendants.**

**No. 97–3479–CV–S–RGC.**

United States District Court,
W.D. Missouri,
Southern Division.

Oct. 23, 1997.

Jim Bensman, East Alton, MO, Charles Phillips, Boonville, MO, Devin Scherubel, Columbia, MO, for Plaintiffs.

Earl W. Brown, III, U.S. Atty's Office, Springfield, MO, Kenneth E. Kellner, Dept. of Justice, Washington, DC, for Defendants.

Steven D. Harrell, The Wrong Law Firm, Springfield, MO, Joseph Michael Klise, Crowell & Moring, Washington, DC, Searcy W. Harrell, Harrell & Lindsey, Camden, AR, for Intervenors.

## ORDER

RUSSELL G. CLARK, Senior District Judge.

On September 23, 1997, three *pro se* plaintiffs filed this action against the United States Forest Service ("Forest Service") and the United States Fish and Wildlife Service ("Fish and Wildlife Service"), charging them with violations of the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1543, the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332 *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 702 *et seq.* Plaintiffs challenge three decisions of the Forest Service pertaining to the harvesting of trees: the Panther Hollow project and the two timber salvage sales involved in the preliminary injunction motion currently before the Court.

On the same day that the plaintiffs filed their claims, the Court issued a Temporary Restraining Order ("TRO") on the proposed timber salvage sales in order to halt the removal of timber blown down or damaged in a windstorm on March 1, 1997. The Forest Service had already signed contracts with private logging companies to salvage the trees damaged in the Windstorm Salvage East and Windstorm Salvage West timber sales regions of the Mark Twain National Forest ("Mark Twain Forest"). Salvage operations were imminent.

On October 17, 1997, the Court held a hearing on plaintiffs' motion for a preliminary injunction on the Windstorm Salvage sales. The Court allowed three logging companies who had purchased the salvage contracts from the Forest Service, as well as two associations representing timber interests, to intervene in the action. The Court has reviewed the administrative record and based on the reasoning below will enjoin the Forest Service from continuing with the Windstorm Salvage East and Windstorm Salvage West timber sales.

## I. FACTUAL BACKGROUND

Mark Twain National Forest consists of almost one and a half million acres and spreads out across southern Missouri, divided into nine separate blocks of land. (AR Tab E3 at I–1).[1] One tract of the Mark Twain is located in central Missouri. *Id.* The Mark Twain is the only National Forest in Missouri. *Id.* On March 1, 1997, a windstorm blew down thousands of trees within a twelve-mile corridor, approximately one-mile wide. (AR Tab A1). This strip began on the west side of the Irish Wilderness, continued in a northeasterly direction through the wilderness area and the Eleven Point National Scenic River, and ended several miles to the east. *Id.* Following a period of public comment, the Forest Service determined that this timber should be salvaged from areas not within the wilderness area. (AR Tab C7 at 1). The Forest Service contracted with

---

1. Throughout this Order, the Court will cite to the Administrative Record with the notation "AR." Unless otherwise noted, "AR" designates the administrative record provided by the Forest Service. If "AR" is followed by "FWS," the Court is referring to the administrative record provided by the Fish and Wildlife Service.

local companies to harvest trees that were "blown down, leaning, or uprooted." *Id*

The area near this salvage sale, however, is also home to the Indiana bat (*"myotis sodalis"*). (AR Tab D5 at 3). The Indiana bat has been listed as an endangered species since 1967. (AR Tab G8 at 1). After a population decrease of 28% between 1960 and 1975, the Fish and Wildlife Service issued an extensive twenty-year recovery plan in 1983 in an effort to prevent any further demise of the Indiana bat. *Id*. Unfortunately, this plan has had little success, especially in Missouri. Missouri is home to over half of the world's Indiana bats. (AR Tab D5 at 10). Since the recovery plan's implementation in 1983, the Indiana bat's population in Missouri has decreased by 82%. (AR Tab D5 at 10). This extraordinary decline has continued despite efforts aimed at protecting the Indiana bat.

Environmentalists first thought that saving the Indiana bat could best be achieved by protecting their winter habitat. Indiana bats begin to hibernate in caves—called "hibernacula"—in October and November after a fall mating period. (AR Tab G5 at 21, 23). During this mating ritual, males and females "swarm" around the entrance to the cave. (AR FWS Tab G at 1). The bats also forage over forests and water, ingesting large numbers of insects in an effort to increase their fat reserves for the hibernation period. They roost in large clusters within the caves. Scientists first thought that the reason for the continually decreasing population could be traced to disasters, either natural or man-made, that affected large numbers of the bats at once within these roosts. However, the plan formulated in 1983 protected these winter habitats by mandating gates to prevent predators—and man—from entering the caves during the bats' hibernation. Still the population declined. (AR Tab G10 at 7, AR FWS Tab H at 1).

Now attention has shifted to the loss of summer habitat of the Indiana bat as the primary reason for the apparent crisis in the number of Indiana bats. (AR Tab G7 at 5, Tab G8 at 1). In the spring, female bats leave the caves first and fly northward. (AR Tab G8 at 2). The females congregate at favorite roosting sites in Northern Missouri and Iowa and set up maternity colonies in which they raise their young. (AR Tab G8 at 6). Some males accompany the females, but little is known about the habitats of the majority of the male bats. (AR Tab G5 at 21, AIR FWS Tab G at 4). Recent studies indicate that many male bats remain in the area of the caves, awaiting the return of the females in the fall, when the mating process begins again. (AR Tab G7 at 4).

The bats roost in dead or dying trees in the summer. (AR Tab G2 at 2). The females burrow under the bark and roost in small clusters. (AR Tab G8 at 6). Some maternity colonies have contained as many as one hundred females and young. (AR tab G5 at 23). The Indiana bat prefers shagbark hickory as a roosting tree, but they also have been found in oak, elm, sycamore, maple, cottonwood, and ash. (AR Tab G8 at 8–9). Studies that have researched the male summer habitat reveal that the males live sometimes very close to the winter cave area to as far as almost ten miles away. (AR FWS Tab K at 95, 98).

One other focus for the protection of the Indiana bat revolves around preventing disturbance to the bats during hibernation. (AR Tab G5 at 7). In the fall, bats enter the caves with only enough fat reserves to last until spring. (AR FWS Tab G at 6). Arousal causes depletion of the fat reserves necessary for survival. *Id*. Each disturbance can use from ten to thirty days of fat supply. *Id*. Too many disturbances can cause the bats to leave the caves prematurely, causing death. *Id*.

## II. STANDARD OF REVIEW

The Eighth Circuit has established the test for whether a preliminary injunction should be granted. The Court must balance the following factors: (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that the movant will succeed on the merits; and (4) the public interest. *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109, 113 (8th Cir.1981). However, some courts have held that when a preliminary injunction concerns the ESA, the traditional balancing of hardships is inapplicable. "In Congress's

view, projects that jeopardized the continued existence of endangered species threatened incalculable harm: accordingly, it decided that the balance of hardships and the public interest tip heavily in favor of endangered species. We may not use equity's scales to strike a different balance." *Sierra Club v. Marsh,* 816 F.2d 1376, 1383 (9th Cir.1987) (citing *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 187–88, 194–95, 98 S.Ct. 2279, 2298–99, 2301–02, 57 L.Ed.2d 117 (1978)); *House v. United States Forest Service,* No. CIV.A. 96–446, 974 F.Supp. 1022, 1997 WL 567044, at *3–4 (E.D.Ky. May 29, 1997). As discussed below, under either test, the plaintiffs have met their burden.

The Court reviews the Forest Services intention to proceed with the timber sale under the narrow "arbitrary and capricious" standard prescribed by the Administrative Procedure Act, 5 U.S.C. § 702 *et seq.* The Court must determine if the Forest Service and Fish and Wildlife Service considered the "relevant factors," whether the agencies made a "clear error in judgment," and, therefore, acted arbitrarily or capriciously. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). However, reviewing courts must not " 'rubber-stamp . . . administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute.' " *Bureau of Alcohol, Tobacco & Firearms v. Federal Labor Relations Authority,* 464 U.S. 89, 97, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983) (quoting *NLRB v. Brown,* 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965)). The agency action must not be "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law." 5 U.S.C. § 706(2)(A).

## III. ANALYSIS

### A. The Endangered Species Act (ESA)

Enacted in 1973, Congress stated that the purpose of the ESA was to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species. . . ." 16 U.S.C. § 1531(b). The key term, "conservation" means that "all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures . . . are no longer necessary" should be used. 16 U.S.C. § 1532(3). The ESA mandates that

> [e]ach Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species. . . . In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

16 U.S.C. § 1536(a)(2). "The plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost." *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* 515 U.S. 687, 699, 115 S.Ct. 2407, 2413, 132 L.Ed.2d 597 (1995).

Plaintiffs charge that the Forest Service violated the ESA by: (1) failing in their duty to place top priority on the conservation of the Indiana bat; (2) omitting consideration of a study done on the habitat of the bats during the fall—the period during which the harvesting of the trees would be accomplished; (3) approving the timber sale which will "harm" or "harass" the Indiana bat, thus constituting a "taking"; and (4) failing to enter into formal consultation with the Fish and Wildlife Service.

### 1. The 60–Day Notice Requirement

Defendants first allege this Court has no jurisdiction for plaintiffs' ESA claims because the plaintiffs failed to give the Forest Service the statutory 60–day written notice that they intended to sue, which is required under the provisions of the ESA. 16 U.S.C. § 1540(g). However, plaintiffs stated in a July 7, 1997 Appeal to the Regional Forester, which challenged the Windstorm Salvage West sale:

> The Appellants wish to make it clear that the only reason why they have not filed a lawsuit over the Panther Hollow Project yet, is because they believe that the deci-

sion needs to be revised because of the tornado. If this project and the Panther Hollow Decision are not remanded in the appeal decision, the Appellants plan to promptly file a lawsuit challenging both decisions.

(AR Tab F–W1 at 4). In an appeal of the Windstorm Salvage East sale, also dated July 7, 1997, plaintiffs told the Regional Forester that the plaintiffs had "informed the USFWS that they will be sued over rubber-stamping the BEs for the Panther Hollow sale and the Instant sale." (AR Tab F–E1 at 7). The Court finds that this provided the Forest Service and the Fish and Wildlife Service adequate written notice that plaintiffs intended to bring a citizen suit.

### 2. The Substantive Claims Under the ESA

▇Defendants maintained at the preliminary injunction hearing that the Court must apply a traditional balancing test to determine if the Forest Service acted arbitrarily or capriciously, weighing the harm the agency action would impose on the Indiana bats against the other competing interests of the Forest Service. The Supreme Court has stated, however, in unequivocal terms:

> The plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost.... [T]he legislative history undergirding § 7 reveals an explicit congressional decision to require agencies to afford first priority to the declared national policy of saving endangered species. *The pointed omission of the type of qualifying language previously included in endangered species legislation reveals a conscious decision by Congress to give endangered species priority over the "primary missions" of federal agencies* .... [T]he plain language of the Act, buttressed by its legislative history, shows clearly that Congress viewed the value of endangered species as "incalculable."

*Tennessee Valley Authority v. Hill,* 437 U.S. 153, 185, 187, 98 S.Ct. 2279, 2297–98, 57 L.Ed.2d 117 (1978) (emphasis added). Further, the Forest Service's own Land and Resource Manual for the Mark Twain National Forest mandates that protection needs for endangered species should take priority over project objectives. (AR Tab E–3 at IV–50). Thus, the Court concludes that the Forest Service is bound by the ESA and their own Forest Plan to place the Indiana bat at the top of their priority list.

▇ Defendants list the following factors as significant in their decision to allow the sale: (1) to reduce fuel accumulation; (2) to facilitate new tree growth; (3) to remove the hazards to the safety of the public; and (4) to utilize the "naturally harvested" trees to meet the public demand for wood products. (AR Tab C–6 at 2, Tab C–7 at 2). The Court finds that the Forest Service gave only a cursory nod to the existence of the Indiana bat within the proposed sale area, which flies in the face of the mandates of the ESA, as well as the Forest Service's own regulations.

However, even applying a balancing test to these factors, the Court finds that protection of the Indiana bat's habitat far outweighs the factors endorsed by the Forest Service. The salvage operation will remove only logs. All of the small limbs will be cut and left lying on the ground "not over 30 inches" tall. The Court can imagine no better fire source than dead tree limbs stacked 30 inches tall on the forest floor. Further, the likelihood of a tree falling on an errant hiker is far more remote than the harm posed to the Indiana bat by removal of possible roost trees. Viewed against the destruction of habitat of a species whose numbers have declined by 82 % in Missouri in spite of conservation efforts since 1983, the remaining factors do not prevent the Court from finding that the Forest Service acted arbitrarily and capriciously.

▇ The Forest Service determined that the proposed Windstorm Salvage sales were "not likely to adversely affect" the Indiana bat. The Forest Service further maintains that any affect would be "discountable." The ESA prohibits anyone from "taking" an endangered species. 16 U.S.C. § 1538(a)(1)(B). "Taking" includes actions which harm or harass the species at issue. 16 U.S.C. § 1532(19). This prohibition against taking is broadly construed to prohibit nearly any activity which might adversely affect protected species. *Defenders of Wildlife v. Administrator, EPA,* 688 F.Supp. 1334, 1351 n. 33 (D.Minn.1988), *aff'd in part, rev'd in part,*

882 F.2d 1294 (8th Cir.1989). One court has observed:

A finding of "harm" does not require death to individual members of the species; nor does it require a finding that habitat degradation is presently driving the species further toward extinction. Habitat destruction that prevents the recovery of the species by affecting essential behavioral patterns causes actual injury to the species and effects a taking under section 9 of the Act.

*Palila v. Hawaii Dept. of Land & Natural Resources,* 649 F.Supp. 1070, 1076–77 (D.Haw.1986), *aff'd,* 852 F.2d 1106 (9th Cir. 1988). Harass is defined as an act "which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding or sheltering." 50 C.F.R. § 17.3.

Possible harm or harassment to the Indiana bat from the salvage operations could arise from: (1) removal of dead or dying trees which could be roost trees used by male bats in the summer; (2) activity in the vicinity of the hibernaculum during the fall swarming season; and (3) disturbance to the roosting male and female bats in the hibernaculum, resulting in the depletion of fat stores.

■ The Forest Service claims that no *known habitat* will be involved in the current sale. Yet, throughout the administrative record, study after study observes that little research has been done to determine the exact habitat of the male bats in the summer. The Recovery Plan for the Indiana bat prepared by the Fish and Wildlife Service in 1983 observes:

Little is known about Indiana bat summer habitat. . . . Distribution of males during the summer is not well known. A few individuals have been found in caves. Others have been observed feeding in floodplain and upland forests. . . . Forest is being destroyed throughout much of the range of the Indiana bat. . . . *The destruction of forest habitat could have a serious impact on Indiana bat populations.* Of particular importance is the increasing demand for use of wood as fuel, which threatens dead standing trees that are potential roost sites. *Further re-*

*search is needed to identify optimal summer habitat and to evaluate the effects of forest destruction throughout the range of this species.*

(AR FWS Tab G at 4–6) (emphasis added). The Forest Service may not insist that because no "known" population of Indiana bats use the trees to be salvaged, they are exempt from the requirements of the ESA. They are under an affirmative duty to identify the habitat of the Indiana bat and conduct further research if necessary.

In one of the few studies done on the summer habitat of the male Indiana bat, the researcher found that the male established a roost approximately ten miles from the winter hibernaculum. (AR FWS Tab K at 95). The Forest Service acted arbitrarily and capriciously when it chose to ignore this information. The Forest Service cannot suggest that because few studies existed (and it did not conduct any studies of its own, relying instead on the assertion that no Indiana bats had been observed), it may then ignore the findings of the one study directly on point because the effect of the proposed timber sales would be "discountable." This would result in incentives to conduct no research, thus avoiding the mandates of the Recovery Plan for the Indiana bat, as well as the provisions of the ESA.

Numerous references in the administrative record document the continued decline in population of the Indiana bat, despite ongoing protection of the hibernaculum. Researchers note that it is protection of the summer habitat and foraging area that should be the focus of new protection efforts. The Forest Service now seeks to salvage timber blown down by a windstorm. However, not only will downed trees be harvested, all uprooted and leaning trees will be removed in the sale area. These areas are within two and four miles of the bat hibernaculum. Male bats certainly could use those areas in the summer for roost trees. The only trees that the Forest Service does not seek to remove are "damaged" trees still standing. The Court is left wondering what kind of tree that might be. A tree with a broken limb? Limbs are blown off trees every day, yet the tree will continue living.

The tree preferred by the Indiana bat is a standing *dead or dying* tree and these are exactly the trees that the Forest Service has sold to the salvage contractors. Because it is known that the male Indiana bat resides in these kind of trees, it is arbitrary and capricious for the Forest Service to conclude that they may remove "uprooted or leaning" trees.

The other harm that could result from the Forest Service's salvage sale would be a disturbance of the bats during their crucial fall mating season. In addition to upsetting the breeding cycle by logging activities near the hibernaculum, the bats also count on this time to build up fat reserves for the winter hibernation. The presence of the salvage operations on both sides of the hibernaculum would be likely to adversely affect their hunting activities.

Not only would the proposed sale interfere with the bats efforts at attaining fat stores, it could also affect the depletion of the fat stores during hibernation. One of the proposed timber sales is within two miles of the hibernaculum. Forest logging activities involve heavy machinery including trucks both to lift and haul the logs, as well as chain saws to cut the smaller limbs. This necessarily can generate a significant amount of noise. Any disturbance to the bats causes critical depletion of the fat reserves necessary for survival. While the Windstorm Salvage East area is four miles away and, therefore, not likely to inflict this harm, the Court has no power to make its own decision regarding the proposed salvage sales by imposing new conditions. *See Downer v. United States by and Through U.S. Dept. of Agriculture*, 97 F.3d 999, 1002 (8th Cir.1996). The Court's role must be limited to review of the agency decision to determine if the agency acted arbitrarily. In this case, the Court finds that it did.

Plaintiffs also charge that the Forest Service violated the ESA by failing to enter into formal consultations with the Fish and Wildlife Service. If an agency determines that its actions "may affect" a protected species or its habitat, then that agency must enter into consultation with the Fish and Wildlife Service to ensure that the actions are not likely to jeopardize the continued existence of any listed species. 50 C.F.R. § 402.14. Consulta-tion may be either informal or formal. If during informal consultation, the agency and the Fish and Wildlife Service concur in writing that the proposed action is "not likely to adversely affect" a protected species, then the consultation process is complete. 50 C.F.R. §§ 402.13, 402.14(a), (b).

█ In the instant case, the Forest Service and the Fish and Wildlife Service agreed that the proposed salvage sales were "not likely to adversely affect" the Indiana bat. As described above and after review of the administrative record, that decision was arbitrary and capricious, constituting a clear error. The Endangered Species Act Consultation Handbook provides guidance as to when formal consultation is required: "Is likely to adversely affect—the appropriate conclusion if any adverse effect to listed species or critical habitat may occur as a direct or indirect result of the proposed action or its interrelated or interdependent actions.... An 'is likely to adversely affect' determination requires formal section 7 consultation." Endangered Species Act Consultation Handbook at 3–7. The Forest Service should have entered into formal consultation with the Fish and Wildlife Service.

## B. The National Environmental Policy Act (NEPA)

█ Plaintiffs also contend that the Forest Service and Fish and Wildlife Service erred when they failed to take a "hard look" at foreseeable environmental consequences. NEPA dictates the procedures by which agencies must consider the environmental impacts of their actions. NEPA requires an agency to complete an environmental impact statement ("EIS") for a "major federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). However, agencies may avoid the preparation of an EIS if they determine that an action would not be "significant" after a careful examination through an Environmental Assessment ("EA"). 40 C.F.R. § 1507.3(b)(2). If the agency determines that an EIS is not necessary, they issue a Finding of No Significant Impact ("FONSI"). 40 C.F.R. § 1508.13. NEPA commands that the agency cannot proceed with an action until it has taken a "hard look" at foreseeable

environmental consequences. *Sabine River Authority v. Department of Interior,* 951 F.2d 669, 676–77 (5th Cir.), *cert. denied,* 506 U.S. 823, 113 S.Ct 75, 121 L.Ed.2d 40 (1992).

NEPA created the Council on Environmental Quality ("CEQ") to provide guidance on agency compliance with NEPA. 42 U.S.C. §§ 4341–4347. In determining if an action have significant effects, the CEQ regulations mandate that the defendants consider the "severity of impact" in several areas, including, "The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973." 40 C.F.R. § 1508.27(9). A court may not substitute its judgment, "once the agency has adequately studied the issue." *Kelley v. Selin,* 42 F.3d 1501, 1518 (6th Cir.), *cert. denied,* 515 U.S. 1159, 115 S.Ct. 2611, 132 L.Ed.2d 855 (1995).

Thus, the Court is limited to examining whether the Forest Service took a "hard look" at the environmental consequences of the salvage sales prior to issuing the FONSI. *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). The Court has already found that the Forest Service acted arbitrarily by failing to gather research on the presence of the Indiana bat in the salvage area and ignoring the possible adverse effects on the Indiana bat demonstrated in the administrative record.

On March 25, 1997, the Forest Service sent a letter to the Fish and Wildlife Service, asking for a "quick turn-around" in order to send out the required 30–day public comment period around the first of April. (AR FWS Tab A at 1). On April 10, 1997, the Forest Service issued a decision memo on the existence of "extraordinary circumstances" which may have potential significant effects. This memo declared that a Biological Evaluation ("BE") done for the proposed sales "showed that no listed species or critical habitat occurs in any of the stands." (AR Tab C4 at 1). The Court would characterize this as an "extraordinary" turn-around rather than just "quick." Unfortunately for the Forest Service and the Fish and Wildlife Service, this is not the "hard look" mandated by NEPA. The Court finds that an EIS should have been prepared.

Procedures set out in the Forest Service Handbook specifically allow a sale to be categorically excluded from documentation in an environmental assessment ("EA") or an environmental impact statement ("EIS") where the proposed action is within a listed category and where there are no extraordinary circumstances. Forest Service Handbook [hereinafter "FSH"] 1909.15 Ch. 30.3(1)(b). The Forest Service argues that the salvage sales fit neatly into such a category. FSH 1909.15, Ch. 31.2(4). The proposed sales will remove less than 1,000,000 board feet of timber. The Court finds that a categorical exclusion is not justified because of the presence of an endangered species.

■ Whether the Court views the standard for granting the preliminary injunction under *Dataphase* or follows the mandate of Congress as interpreted by the Supreme Court in *TVA v. Hill,* the result is the same: the continued decline and possible extinction of a species weigh heavily to tip the balance to favor granting the injunction. The public interest is best served by protecting endangered species. The Court has already not only discussed the likelihood that the plaintiffs would succeed on the merits, but indeed has found that the Forest Service violated the ESA. Finally, death is certainly an irreparable harm and the extinction of a species is "incalculable." While those individual timber companies will regrettably lose a few contracts, this harm is negligible in light of the continuing decline of the Indiana bat. The public interest lies on the side of protecting the endangered species.

Accordingly, it is hereby

ORDERED that Plaintiffs' Motion for a Preliminary Injunction is granted; and it is further

ORDERED that the Clerk shall issue a preliminary injunction against Defendants to enjoin them from proceeding with the Windstorm Salvage East and Windstorm Salvage West projects until they are in compliance with the Endangered Species Act.