TOMAC, Plaintiff,

v.

Gale A. NORTON, Secretary, U.S. Department of the Interior, et al., Defendants.

No. CIV.A. 01–0398(JR).

United States District Court, District of Columbia.

Jan. 21, 2003.

Rebecca A. Womdeldorf, Joe G. Hollingsworth, Stephen A. Klein, Spriggs & Hollingsworth, Washington, DC, William C. Fulkerson, Daniel K. DeWitt, Robert J. Jonker, Daniel P. Ettinger, Warner Nor-

cross & Judd LLP, Grand Rapids, MI, for Plaintiff.

Frances M. Zizila, Indian Resources, Section/ENRD, U.S. Department of Justice, Washington, DC, for Defendants.

Reid Peyton Chambers, Sonosky, Chambers, Sachse, Endreson & Perry, Washington, DC, David Michael Peterson, Butzbaugh & Dewane, P.L.C., St. Joseph, MI, Harold George Schuitmaker, Schuitmaker, Cooper & Schuitmaker, Paw Paw, MI, for Amici Curiae New Buffalo Township, Michigan and City of New Buffalo, Michigan.

## MEMORANDUM AND ORDER

ROBERTSON, District Judge.

This memorandum sets forth the reasons for the accompanying order denying the government's motion for summary judgment as to the NEPA claim of TOMAC that was not dismissed by this Court's order of March 29, 2002, and remanding this case for further consideration.

The facts of the case and its procedural history were set forth in a memorandum that accompanied the March 29 order and will not be repeated here. Since March 29, the Court has heard oral argument by the parties, and by *amici* State of Michigan, New Buffalo Township, and City of

New Buffalo, and has considered supplemental submissions by the parties concerning certain revisions to the plans for the roadway, parking lot, and footprint of the proposed casino facility.

## Analysis

■ The core issue that remains to be resolved concerns the validity of the Bureau's environmental assessment and finding of no significant impact (FONSI) under the National Environmental Protection Act (NEPA).[1] NEPA requires federal agencies to prepare environmental assessments for major proposed actions to determine whether they will "significantly affect[ ] the quality of the human environment." If there will be a significant impact, the agency must go on to conduct a full environmental impact statement (EIS). 42 U.S.C. § 4332(2)(c); 40 C.F.R. § 1501.4. Judicial review of a FONSI must ensure that an agency has not ignored any "arguably significant consequences," but must leave evaluation of the impact of such consequences to the agency's judgment unless that judgment is shown to be irrational.[2] Thus, a FONSI may only be overturned if the decision not to prepare an impact statement was arbitrary, capricious, or an abuse of discretion. *Public Citizen v. Nat'l Hwy. Traffic Safety Admin.*, 848 F.2d 256, 266–67 (D.C.Cir.1988). The controlling case law in this Circuit requires consideration of (1) whether the

---

1. Aside from its continuing argument that the Bureau should have considered the validity of the Pokagon's gaming compact with the state of Michigan (which was addressed in the Court's opinion of March 29, 2002), TOMAC has presented no further argument that the Bureau violated its own regulations in the decision to take the land it trust. Defendants are entitled to summary judgment on that claim.

2. Neither NEPA nor regulations clearly define what constitutes a "significant" effect, but factors to be considered include the existence of beneficial as well as adverse effects, the

degree of any adverse impact on endangered or threatened species, the degree to which effects are likely to be highly controversial or involve uncertain or unique risks, the degree to which the action may establish a precedent or represents a decision in principle about a future consideration, and the degree to which the action threatens a violation of any federal or state environmental requirements. 40 C.F.R. § 1508.27. Even an action that on balance will have beneficial effects may still cause a significant impact requiring a full EIS. *Id.*

48

agency identified the relevant areas of environmental concern; (2) whether it took a "hard look" at the environmental consequences of its proposed action; (3) whether it made a convincing case that the problems studied would have insignificant impacts; and, if an impact of significance was identified, (4) whether the agency established convincingly that changes in the project sufficiently minimized it. *Sierra Club v. Peterson,* 717 F.2d 1409, 1413 (D.C.Cir.1983).

TOMAC raises arguments concerning all four *Sierra Club* elements plus a number of additional issues,[3] but the major dispute is over whether BIA took a "hard look" at four particular impacts and whether it made a convincing case that those impacts would not be significant.

## 1. Wetlands

With two intermittent streams and more than 50 wetlands scattered across the 675-acre New Buffalo site, impact on wetlands habitat has been a concern since the beginning of the project. In November 2000, the Pokagon proposed shifting the 50-acre casino complex to a new location within the larger site and carefully redrew the road connecting the facility to public roads to avoid wetlands areas. The Band's consultants concluded that only .08 acres of wetlands would be impacted under the revised proposal, but the U.S. Army Corps of En-

gineers identified five additional one-acre wetland areas "in the areas of the 675-acre parcel that are proposed for development" when it visited the site on November 29, 2000. EA at 19. Instead of waiting for the Corps' final report and analysis of those additional wetlands, the BIA's January 2001 environmental assessment skated over the problem, stating that only .08 acres of wetlands are expected to be disturbed, *id.,* and noting that the Corps will have authority to require mitigation measures when and if it decides a wetland permit is required under the Clean Water Act. TOMAC argued that the Bureau's wetlands analysis failed to provide the "hard look" and convincing explanation of insignificance required under NEPA.

Government counsel suggested at oral argument that the Bureau did not consider the five additional acres to be significant because they were not located within the boundaries of the 50-acre proposed complex. That explanation was unsatisfactory. Not only was it post hoc lawyer reasoning, but it was at odds with the text of the environmental assessment, which stated that the Corps had reviewed the wetlands delineations "in the areas of the 675-acre parcel that are proposed for development."

 Another round of briefing, addressing the wetlands issue, followed oral argument. BIA submitted a revised map

3. The March 29 memorandum addressed TOMAC's argument that it was arbitrary for the Bureau not to consider the possibility that the Pokagon would not be able to resolve questions about the legality of their gaming compact with the State of Michigan. TOMAC has presented no authority for the proposition that the risk of project failure must be evaluated under NEPA.

The Bureau was not required to evaluate the possibility that the Pokagon might someday attempt additional development on the New Buffalo track. The Band has announced no such plans, and BIA has concluded that

such development is not reasonably foreseeable because of various conditions and limitations on the property. EA, App. U, pt. 1 at 17–18; *Society Hill Towers Owners' Ass'n v. Rendell,* 210 F.3d 168 (3d Cir.2000); *Penn. Protect Our Water & Envt'l Resources, Inc. v. Appalachian Regional Comm'n,* 574 F.Supp. 1203 (M.D.Pa.1982).

The Pokagon's agreement with local governments will not preclude declaratory or injunctive relief, if needed in the future to ensure compliance with health, safety, and environmental standards.

showing where the additional five wetlands areas were, Supplemental Memorandum Ex. 1, and the declaration of Herb Nelson, stating that the additional wetlands were evaluated by BIA prior to the FONSI, Supplemental Memorandum Ex. 2. Both the map revisions and the Nelson declaration were created after the date of the FONSI but present "information that was known by the BIA prior to the issuance of the FONSI," *id.* ¶ 3. The information, according to Nelson, was computer data pinpointing the boundaries of the wetlands using GPS equipment, *id.* ¶ 5. It was on the basis of this information, Nelson declares, that BIA determined that the project would have "no impact on wetlands during Phase I and a 0.08 acre impact during Phase II, if Phase II is developed," *id.* ¶ 6. BIA proffers the revised map and the Nelson declaration, extra-record materials, under the authority of *Camp v. Pitts,* 411 U.S. 138, 143, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973), and *Environmental Defense Fund v. Costle,* 657 F.2d 275, 285 (D.C.Cir.1981), as "additional explanation of the reasons for the agency decision." TOMAC first calls these new materials "post-hoc rationalization," Response to Supplemental Memorandum p.3—they are not—and then asserts that they do not support BIA's claims in any event—but they do. BIA's failure to ensure that the site map attached to its environmental assessment was accurate is an embarrassing indicator of the haste with which its decision was finalized on the last day of the Clinton Administration, but it is not an indicator of arbitrary or capricious action or of an abuse of discretion.

## 2. Impacts on State Threatened Species

■ TOMAC accuses BIA of making a similar rush to judgment concerning the casino's impact on state-protected plant species, but its argument on this issue is not compelling.[4] The Bureau decided not to wait until late spring or summer to conduct surveys of certain plants and to obtain a "no effect" letter from the Michigan Department of Natural Resources before issuing the FONSI, but the environmental assessment identifies a number of factors supporting the no significance conclusion. The Pokagon's decision to relocate the proposed casino in November 2000 avoided two protected plant species' habitats and placed the complex on land that had been in active crop production and thus was relatively unlikely to have wild species. EA at 23. The Bureau also had its consultants (who had conducted an on-site survey) review a report by TOMAC's experts (who had not), and concluded that " '[g]iven the responses provided by federal and state resource agencies, the rarity of the species listed in [TOMAC's consultants' report], and the limited amount of proposed impacts to the potential habitats not already being entirely avoided, there is little likelihood of impacts to rare species and/or critical habitats.' " *Id.* at 23–24; *see also* EA App. L, M.

■ Although the environmental assessment omits a few threatened species identified by the Bureau's consultants from the list of impacted plants, *compare* EA at 10, 23, *with* AR 855, the Bureau did consider available data on the potential impacts and explain its conclusions. A court may not

4. The federal government's taking of land in trust exempts it from state regulation, but the Pokagon promised as part of an agreement with local governments to enact tribal legislation on health, environment, and construction matters that is at least as strict as local and state standards. Although the final environmental assessment is ambiguous as to whether a no effect letter from the State of Michigan is legally required, it assumes that state standards apply if only via Tribal law.

secondguess an agency's determination that the costs of delay outweigh the benefits of further study, *State of Alaska v. Andrus,* 580 F.2d 465, 472–74 (D.C.Cir. 1978), *partially vacated on other grounds,* 439 U.S. 922, 99 S.Ct. 303, 58 L.Ed.2d 315 (1978), and must accord particular deference to agencies in choosing among conflicting experts' reports on matters requiring technical expertise. *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989).

### 3. Impacts on federal endangered species

TOMAC's third argument concerns a report by the U.S. Fish and Wildlife Service on January 11, 2001, indicating that it had received new information that the casino site falls within the maternity range of the endangered Indiana bat. No bats have actually been documented there, however, and FWS concluded that the casino development was not likely to affect the Indiana bat adversely "[i]f efforts are made to leave as many potential roost trees as possible and minimize impacts to potential Indiana bat habitat." Specifically, FWS indicated that the bats roost in trees that are at least nine inches in diameter at breast height with crevices or exfoliating bark. EA App. D. Based on this information, the environmental assessment concludes that the potential impacts had been mitigated by the change in casino location within the tract (which reduced tree clearing from 30 to 7 acres) and by the Pokagon's commitment to preserve roost trees wherever possible. EA at 21–24.

■ Two cases cited by TOMAC in which district judges found arbitrary and capricious action in the clearing of trees are similar to this one mostly because both involved Indiana bat populations. *Bensman v. U.S. Forest Serv.,* 984 F.Supp. 1242 (W.D.Mo.1997) (preliminary injunction);

*House v. U.S. Forest Serv.,* 974 F.Supp. 1022, 1036 (E.D.Ky.1997). In this case, BIA did not rely solely on the Fish and Wildlife Service because it consulted an expert at Eastern Michigan University who appears to have provided much more detailed information about bat roosting habits and roosting trees than was used in *Bensman.* Agencies are "surely entitled to seek and cite [other federal agencies'] expert judgment regarding [specific impacts]," *Public Citizen v. Nat'l Hwy. Traffic Safety Admin.,* 848 F.2d 256, 267 (D.C.Cir.1988). The record contains no evidence indicating that the project's impact on the Indiana bat would in fact be significant. The Bureau's treatment of this issue was not arbitrary or capricious.

### 4. Impacts from growth and development

■ The final and most difficult issue concerns the Bureau's analysis of the casino's indirect effects, which NEPA regulations define as reasonably foreseeable impacts that are removed in time or distance from the immediate federal action, including "growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." 40 C.F.R. § 1508.8. Several courts have struck down FONSI decisions where agencies failed to evaluate the growth-inducing effects of major federal projects in small communities. *See, e.g., Sierra Club v. Marsh,* 769 F.2d 868, 877–82 (1st Cir.1985) (cargo port and causeway connecting small island to mainland); *City of Davis v. Coleman,* 521 F.2d 661, 675–76 (9th Cir.1975) (highway interchange in rural area for purpose of economic development); *Friends of the Earth, Inc. v. U.S. Army Corps of Engineers,* 109 F.Supp.2d 30, 40–41 (D.D.C.2000) (three casino

barges in rural area). *But see Hoosier Env'l Council, Inc. v. U.S. Army Corps of Engs.*, 105 F.Supp.2d 953, 998 (S.D.Ind. 2000) (concluding that economic growth from rural casino project was too speculative to require NEPA analysis).

Here, unlike in those other cases, BIA did catalogue a number of socioeconomic effects in the environmental assessment of the Pokagon casino, including (1) the creation of 5,600 permanent jobs at the casino and in the community; (2) a projected population increase of 1,200 workers (approximately 800 within New Buffalo City and Township) and a related demand for additional housing; (3) an unspecified increase in school enrollment, mitigated by existing excess capacity; (4) an estimated $215 million in spending at the casino, $60 million in spending at local retail stores, restaurants, hotels, and vendors, and $300 million in trickle-down spending through the rest of the local economy; and (5) the potential for increased commercial development along the corridor where water and sewer will be extended to the casino site. EA 29–32, 43–44, App. G. But the assessment provides little discussion of the impact of secondary growth on public services, except for schools and water capacity, or on endangered species, wetlands, air quality, or other natural resources. Nor does the assessment clearly explain *why* the agency concluded that such effects would not be significant, although it emphasizes repeatedly that indirect and cumulative development "are under the control" of local municipalities via land use planning and other measures, *id.* at 36.

Although this is a much closer call than cases in which agencies simply failed to address growth inducing effects at all, I have concluded that BIA's analysis is inadequate in at least two respects. First, even if the assessment adequately catalogues "growth inducing effects and other effects related to induced changes in the pattern of land use, population density, or growth rate," it does not address "related effects on air and water and other natural systems, including ecosystems." 40 C.F.R. § 1508.8; *see also id.* § 1508.14 (" 'Human Environment' shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment. This means that economic or social effects are not intended by themselves to require preparation of an environmental impact statement. When an environmental impact statement is prepared and economic or social and natural or physical environmental effects are interrelated, then the environmental impact statement will discuss all of these effects on the human environment."); *Nat'l Ass'n of Gov't Employees v. Rumsfeld*, 413 F.Supp. 1224, 1229–30 (D.D.C.1976) ("This is not to say that the effects on socio-economic factors play no role in environmental decisionmaking under the NEPA procedures. Their role, however, is limited, and is significant only in conjunction with primary environmental impacts.").

For instance, the traffic study focuses only on trips to the casino site itself by visitors and employees, plus a 3 percent general growth factor that is "reasonable for an urbanized area experiencing a development trend" and an added factor for traffic from the Holiday Inn. The study notes that the 3 percent might account for some of the secondary growth stimulated by the casino, but it makes no attempt to estimate the specific impact of at least 17 percent (approximately 800 new workers, not including dependents, in New Buffalo City and Township alone). The air quality analysis apparently was based on the traffic consultants' estimates, EA App. N at 4, and the noise consultants also appear to have focused only on traffic at the casino site. EA App. O at 1–2. The assess-

ment's discussions of groundwater, prime farmland, floodplains and stormwater run-off, wetlands, and wildlife and vegetation do not address secondary growth at all.

The second problem is that the assessment and FONSI do not clearly explain the Bureau's conclusion that an increase of 5,600 new jobs, 800 new employees and their families, and related changes in physical development and natural resource use will not have a significant effect on a community of 4,600. *Cf. Sierra Club v. Marsh,* 769 F.2d 868 (1st Cir.1985) (full environmental impact statement required for project expected to generate 2,750 new jobs in a town of less than 2,500 people). On job creation, for instance, BIA states "[t]he addition of 2,000 jobs on-site and 655 indirect jobs off-site will have a major, but manageable, impact on local employment. An additional 2,920 jobs can be expected to be induced from the spending of the direct and indirect employees, depending on where those individuals reside or shop." EA at 43. Even if "manageable" is a synonym for "insignificant," and even if simply stating the Bureau's conclusion without elaboration is adequate, this passage does not explain why multiplying the number of jobs in a small town does not cross the threshold of significance.

Similarly, the assessment projects a demand for 673 housing units within the City of New Buffalo and New Buffalo Township, but provides no analysis of the impact of that demand on an area that now has only 1800 residences, 600 of them seasonal. And while the FONSI states that "[p]rotective measures have been agreed to by the Pokagon Band to minimize the socioeconomic impacts to the surrounding community. See EA Chapter 5 Mitigation Measures," FONSI at 1, that chapter only addresses wetlands, stormwater drainage, traffic, environmental contamination cleanup, relocation of the complex, closure of

wells and septic tanks on the casino site, floodplain management, and Indiana bat habitat. There is no focus on the project's indirect, growth inducing effects in the discussion of any of those items.

The Bureau need not speculate about hypothetical projects, *Nat. Wildlife Fed'n v. FERC,* 912 F.2d 1471, 1478 (D.C.Cir. 1990), or additional development projects that are not already in the planning stages, *see, e.g., Society Hill Towers Owners' Ass'n v. Rendell,* 210 F.3d 168 (3d Cir. 2000); *Penn. Protect Our Water & Envt'l Resources, Inc. v. Appalachian Regional Comm'n,* 574 F.Supp. 1203 (M.D.Pa.1982), but the Bureau's own projections of growth are not speculation. *Cf., e.g., N.C. Alliance for Transp. Reform, Inc. v. U.S. Dep't of Transp.,* 151 F.Supp.2d 661, 695–97 (M.D.N.C.2001); *Mullin v. Skinner,* 756 F.Supp. 904 (E.D.N.C.1990); *Joseph v. Adams,* 467 F.Supp. 141 (E.D.Mich.1978).

### Conclusion

There is a certain common sense appeal to TOMAC's argument that a 24–hour–a-day casino attracting 12,500 visitors per day to a community of 4,600 residents cannot help but have a significant impact on that community. The Court's role, however, is not to substitute its own evaluation of the severity of those effects, or even to rely on common sense. The Court's task is to ensure that the Bureau has not ignored any "arguably significant consequences," *Public Citizen v. Nat'l Hwy. Traffic Safety Admin.,* 848 F.2d 256, 266–67 (D.C.Cir.1988). BIA will therefore be temporarily enjoined from taking the land in trust, while the environmental assessment is remanded for such further evaluation and elaboration of its reasoning as BIA desires to submit concerning secondary growth issues. The Court cannot determine whether BIA's decisionmaking process was rational based on the conclusory statements in the record about the

extensive growth-inducing effects of the casino. *See Friends of the Earth, Inc. v. U.S. Army Corps of Engineers,* 109 F.Supp.2d 30, 38 (D.D.C.2000) (remanding for further analysis of proposed casino projects where the record included conclusory statements but no actual analysis of impacts); *see also State of Alaska v. Andrus,* 580 F.2d 465 (D.C.Cir.) (each case must be subject to a "particularized analysis" considering the nature of the violations and any countervailing considerations of the public interest), *vacated in part as moot,* 439 U.S. 992, 99 S.Ct. 594, 58 L.Ed.2d 667 (1978).

Accordingly, it is this _____ day of January 2003,

**ORDERED** that defendants' motion for summary judgment [# 21–2] is denied. And it is

**FURTHER ORDERED** that this case is remanded to the Bureau of Indian Affairs.