# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued December 8, 2005          Decided January 6, 2006

No. 05-5206

TOMAC, TAXPAYERS OF MICHIGAN AGAINST CASINOS,
A MICHIGAN NON-PROFIT CORPORATION,
APPELLANT

v.

GALE A. NORTON, IN HER OFFICIAL CAPACITY AS
SECRETARY OF THE UNITED STATES
DEPARTMENT OF THE INTERIOR, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 01cv00398)

*Robert J. Jonker* argued the cause for appellant. With him on the brief were *Daniel P. Ettinger*, *Joseph A. Kuiper*, and *Rebecca A. Womeldorf*.

*Lisa E. Jones*, Attorney, U.S. Department of Justice, argued the cause for Federal Appellees. With her on the brief was *Elizabeth A. Peterson*, Attorney.

*Kaighn Smith, Jr.* argued the cause for Non-Federal Appellees. With him on the brief were *Matthew T. McGrath* and *Cortney O. Morgan*.

Before: GINSBURG, *Chief Judge*, RANDOLPH, *Circuit Judge*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: The Pokagon Band of Potawatomi Indians ("Pokagon Band" or "Tribe") consists of approximately 2,700 members. The Tribe has resided primarily in its ancestral homeland in the St. Joseph River Valley in southwestern Michigan and northern Indiana since at least 1634. *See* 25 U.S.C. § 1300j (2000); S. REP. NO. 103-266, at 1 (1994). After years of dealing with the United States in government-to-government relations, the Tribe was administratively terminated in 1935, when its application for recognition was denied under the Indian Reorganization Act of 1934 ("IRA"), 48 Stat. 984 (codified as amended at 25 U.S.C. § 461 *et seq.* (2000)). Thereafter, the Tribe made numerous attempts to reclaim its recognition, and finally achieved that goal in 1994, with the enactment of the Pokagon Restoration Act ("Restoration Act" or "Act"), 25 U.S.C. § 1300j *et seq.* The Act restored federal services to the Pokagon Band, but it provided no funding, so the Tribe has been forced to seek ways to achieve economic self-sufficiency.

The Tribe has determined that the most effective way to generate revenue is to build and operate a gaming resort. To that end, the Tribe signed a gaming compact with the State of Michigan in 1997 and then purchased rights to the land necessary for the project. Upon application to the Department of Interior's Bureau of Indian Affairs ("BIA" or "Bureau"), the Secretary of the Interior ("Secretary") agreed to take those lands into trust under 25 U.S.C. § 1300j-5, which permits the

Secretary to take land into trust for the purpose of becoming part of the Tribe's reservation.

The Bureau's decision to take this land into trust is now challenged by the Taxpayers of Michigan Against Casinos ("TOMAC"), a group that includes residents who live adjacent to the proposed casino site. In three decisions, the District Court issued judgments for the Department of the Interior ("Interior") on each of TOMAC's claims. The District Court held, *inter alia*, that: (1) BIA reasonably concluded that it only had to prepare an environmental assessment ("EA") and not an environmental impact statement ("EIS") under the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321-4347, *TOMAC v. Norton*, No. Civ.A.01-0398, 2005 WL 2375171, at *6 (D.D.C. Mar. 24, 2005) ("*TOMAC III*"); (2) the Pokagon Band fell within the "restored lands exception" of the Indian Gaming Regulatory Act ("IGRA"), because it was "restored" to federal recognition under the Restoration Act, *TOMAC v. Norton*, 193 F. Supp. 2d 182, 192-94 (D.D.C. 2002) ("*TOMAC I*"); and (3) Congress's delegation to the Secretary to "acquire real property . . . . in trust for the benefit of the Band" under the Restoration Act, 25 U.S.C. § 1300j-5, was not an unlawful delegation of legislative power, *TOMAC I*, 193 F. Supp. 2d at 191-92.

TOMAC now appeals from the District Court's successive grants of summary judgment to Interior, challenging each of the aforementioned findings. We conclude that TOMAC's claims have no merit and affirm the District Court's grants of summary judgment.

## I. BACKGROUND

### A. *The Pokagon Band of Potawatomi Indians*

The Pokagon Band has a long history of dealings with the United States government, including involvement in 11 treaties with the federal government from 1795-1833. *See* 25 U.S.C. §

1300j. One such treaty, the Treaty of Chicago, 7 Stat. 431 (1833), involved the ceding of 5,000,000 acres by several tribes to the federal government in 1833 in exchange for a series of payments and a tract of equal size west of the Mississippi River. *Hannahville Indian Cmty. v. United States*, 4 Cl. Ct. 445, 447 (1983). While this agreement pushed many of the Potawatomi bands west, the Pokagon Band held steadfast and negotiated a supplement to the treaty, which gave them the right to remain in their Michigan homeland. *See id.* at 447-48; S. REP. NO. 103-266, at 2; H.R. REP. NO. 103-620, at 2 (1994).

In 1935, the Pokagon Band petitioned for reorganization under the newly minted IRA, which terminated the federal government's allotment policy and restored to Indians the management of their assets. While tribal governments located in Michigan's upper peninsula were granted federal services under the IRA, those in its lower peninsula, such as the Pokagon Band, were denied services and benefits due to an administrative decision predicated on the "misguided assumption that residence on trust lands held in common for the Band was required for reorganization and the fact that appropriations to purchase such lands had run out." H.R. REP. NO. 103-620, at 5; *see also* S. REP. NO. 103-266, at 3-4. According to the Senate committee report leading to the passage of the Restoration Act authored nearly 60 years later, the Pokagon Band "was unfairly terminated as a result of both faulty and inconsistent administrative decisions contrary to the intent of the Congress, federal Indian law and the trust responsibility of the United States." S. REP. NO. 103-266, at 6.

To remedy this injustice, Congress enacted the Restoration Act in 1994. The Act's specific purpose is to "reaffirm and clarify the federal relationship of the Pokagon Band of Potawatomi Indians of Michigan as a distinct federally recognized Indian tribe, to reaffirm the jurisdiction and other rights of the tribe, provide for the establishment of a trust land

base for the tribe," and "authorize the organization of the tribe and for other purposes." *Id.* at 1. The Tribe's status as a federally recognized tribe was reestablished, 25 U.S.C. § 1300j-1, thus bringing the Tribe within the umbrella of federal services and benefits extended to other federally recognized tribes, 25 U.S.C. § 1300j-2. In recognition of its ancestral homelands and the need for the Tribe to establish a reservation land base, Congress directed the Secretary to acquire real property for the Tribe, by taking land in trust to become part of its reservation. 25 U.S.C. § 1300j-5. Congress also delineated a 10-county area – encompassing the Tribe's current and ancestral homeland – where it is eligible to receive the federal services that accompany recognition. *See* 25 U.S.C. § 1300j-6.

The Restoration Act, however, did not provide any funding, so the Tribe had to consider economic development projects that would enable it both to restore its land base and to fund tribal governmental activities and services. The Tribe concluded that the only economic development that would attract sufficient capital would be a gaming and recreational facility. Consequently, in 1997 the Tribe entered into a compact with the State of Michigan in accordance with 25 U.S.C. § 2710(d)(2000) to permit the Tribe to conduct Class III (casino-style) gaming on "eligible Indian lands." *See* Compact Between the Pokagon Band of Potawatomi Indians and the State of Michigan Providing for the Conduct of Tribal Class III Gaming by the Pokagon Band of Potawatomi Indians at 2-3 (Jan. 29, 1997), *reprinted in* Pokagon Band of Potawatomi Indians Township of New Buffalo Trust Consolidation Site Trust Application (Mar. 2000), app. 3 ("Trust App."), Joint Appendix ("J.A.") 1324. Interior approved this agreement on February 18, 1999. Indian Gaming, 64 Fed. Reg. 8,111 (Feb. 18, 1999).

The Tribe also entered into a "Memorandum of Understanding" ("Memorandum") with the Secretary, which spelled out the amount of land to be taken into trust under the

Restoration Act, the area in which that land was to be located, and the preference that, whenever possible, the land acquired would be contiguous. Memorandum of Understanding (Jan. 11, 1999), *reprinted in* Trust App., *supra*, tab 2, J.A. 1321. In addition, the Secretary confirmed that the Pokagon Band is a "restored" tribe within the meaning of § 2719(b)(1)(B) of IGRA, making it eligible for Class III gaming without having to undertake the more burdensome route to approval under § 2719(b)(1)(A). *See* 25 U.S.C. § 2719(b)(1)(A), (B).

The Tribe subsequently purchased in fee 26 separate and contiguous parcels of land across 675 acres within New Buffalo Township in Berrien County, Michigan, and then submitted an application to BIA requesting that the United States take the land into trust for the Tribe. A portion of that land would house the 110,000 square-foot gaming facility, five or six restaurants, a variety of gift shops, a child care facility, a 200-room first class hotel, and a surface parking lot and parking garage.

Before proceeding with the project, the Bureau was required under NEPA to assess the potential environmental impacts of the gaming resort. NEPA obligates an agency to prepare a detailed, comprehensive EIS if its proposal constitutes a "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C) (2000). To determine what actions meet the § 4332(2)(C) threshold, the Bureau has adopted as advisory guidelines the regulations of the Council of Environmental Quality ("CEQ"), which was established by NEPA to interpret the statute. *See DOT v. Pub. Citizen*, 541 U.S. 752, 757 (2004); NEPA Handbook, Bureau of Indian Affairs Manual Supplement 1, §§ 1.1(B), 1.2, 1.3, J.A. 730-31. Those regulations permit agencies to issue first an EA, which is a "less detailed document which may be used to determine whether or not an EIS is required." *Id.* § 2.2, J.A. 736. If, based on the EA, the agency finds that an EIS is not necessary, the Bureau may issue a "Finding Of No Significant Impact"

("FONSI"), which "fulfills the documentation requirements established by the CEQ regulations." *Id.*; *see* 40 C.F.R. §§ 1501.4(e), 1508.9, 1508.13 (2005).

After working closely with the Tribe, an environmental consultant, and other federal agencies including the United States Fish and Wildlife Service and the Environmental Protection Agency ("EPA") for several months, BIA issued a draft EA of the casino project on November 21, 2000 and made it available for a 30-day comment period. In response to the comments received, BIA prepared a revised and modified assessment in January 2001. The EA analyzed a range of potential impacts of the proposed trust acquisition on geology and soils, prime and unique farmland, groundwater, floodplains, wetlands, wildlife habitat, vegetation, threatened and endangered species, air quality, noise, and cultural resources. *See* EA (Jan. 2001) at 17-30, J.A. 329-42. It also addressed potential impacts on socioeconomics and other issues related to growth induced by the proposed facility. *Id.* at 30-45, J.A. 342-57.

On January 19, 2001, BIA issued a FONSI for the trust acquisition. The Bureau explained that implementation of the proposed actions with corresponding mitigation measures, "will have no significant impact on the quality of the human environment" within the meaning of NEPA. Proposed Pokagon Band of Potawatomi Indians of Michigan Gaming Facility, FONSI, BIA (Jan. 19, 2001), J.A. 308. Thus, an EIS was not warranted. BIA subsequently issued a "Notice of Intent to Take Land into Trust" on January 22, 2001.

## B. *Procedural History*

On February 21, 2001, TOMAC filed a complaint in the United States District Court for the District of Columbia seeking injunctive and declaratory relief against Interior on three grounds that are relevant to this appeal. TOMAC first alleged

that the Secretary's trust acquisition decision violated NEPA, because the gaming and recreation complex will significantly impact the area surrounding the site. Second, TOMAC asserted that the Secretary violated IGRA, because the Restoration Act did not "restore" the Tribe within the meaning of IGRA such that the Tribe qualified for the "restored land exception" to IGRA's gaming ban on lands acquired after October 17, 1988. Finally, TOMAC contended that Congress unconstitutionally delegated to the Secretary unlimited authority to acquire land for the Tribe under the Restoration Act.

In response to TOMAC's claims, BIA challenged TOMAC's Article III and prudential standing to bring its NEPA and IGRA claims, and also moved to dismiss TOMAC's IGRA and constitutional claims for failure to a state claim. In the alternative, BIA moved for summary judgment. The City and Township of New Buffalo and the Tribe moved and were permitted to intervene in the proceedings on behalf of the Government. Thereafter, the United States and TOMAC entered into a stipulation whereby the United States agreed not to take the land into trust during the pendency of the District Court litigation (which has been renewed for the purposes of this appeal).

On March 29, 2002, the District Court rejected BIA's standing contentions, *TOMAC I*, 193 F. Supp. 2d at 188, 190-91, but granted summary judgment against TOMAC on its IGRA and nondelegation claims, *id.* at 191-94. In a separate decision, the District Court considered TOMAC's NEPA challenges concerning wetlands, threatened species, endangered species, and impacts from growth and development. *TOMAC v. Norton*, 240 F. Supp. 2d 45, 48-52 (D.D.C. 2003) ("*TOMAC II*"). Regarding the first three issues, the District Court concluded that BIA sought out and properly considered the available data, thereby fulfilling its responsibility under NEPA. *Id.* at 48-50. The District Court did not find that BIA engaged in the same

level of analysis, however, with respect to the indirect effects related to growth induced by the gaming and recreation complex. The trial court noted that while this case was "a much closer call than cases in which agencies simply failed to address growth inducing effects at all," BIA failed both to "address related effects on air and water and other natural systems, including ecosystems," and to explain clearly its "conclusion that an increase of 5,600 new jobs, 800 new employees and their families, and related changes in physical development and natural resource use will not have a significant effect on a community of 4,600." *Id.* at 51-52 (quotation marks and citation omitted). Based on these flaws, the District Court temporarily enjoined BIA from taking the land into trust, and remanded the EA to the agency "for such further evaluation and elaboration of its reasoning as BIA desires to submit concerning secondary growth issues." *Id.* at 52.

### C. *Supplement to the EA*

On remand, BIA prepared a supplement to its EA ("EA Supplement") to update and expand its earlier analysis and to focus on the District Court's secondary impact concerns. *See* EA Supplement (Aug. 2003), J.A. 776. In addition to identifying the specific geographic areas potentially impacted by the gaming resort, Interior predicted the pattern and extent of casino-induced residential and commercial growth by analyzing, among other things, zoning laws, permitting requirements, economic forecasts, demographics, available utilities, environmental regulations, and land use practices. These development predictions were used to analyze potential impacts on natural and cultural resources including the water supply, sewer system, air quality, transportation and traffic, and public safety. The Bureau also evaluated potential "cumulative impacts" of the gaming resort in combination with other past, present, and potential future operations in the area, and provided

detailed mitigation measures to address any potential significant impacts.

The Bureau concluded that the only potentially significant impact from induced growth was an increased demand for water and sewage services which might tax the existing capacities of those systems. In both cases, the Bureau found that the Tribe's agreement to cover significant portions of the costs to build a new water plant and distribution system, as well as to install oversized sewer lines, sufficiently mitigated any potential harm.

Particularly germane to this appeal is BIA's analysis of the gaming resort's direct and indirect impacts on local air quality. In *TOMAC II*, the District Court found the EA's analysis of the project's impact on air quality to be lacking, primarily because BIA's traffic study was insufficient. *TOMAC II*, 240 F. Supp. 2d at 51 (noting that the EA failed to estimate the impact of the non-casino traffic growth generated by the 17% growth in residency expected as a result of the project). In preparing its EA Supplement, the Bureau commissioned Soil and Materials Engineers, Inc. ("SME") to prepare a revised air quality study. In the revised assessment, BIA directed SME to broaden its focus to capture the impact on air quality of the indirect development activity as a result of the gaming resort. SME thus examined four potential air quality impacts: (1) "vehicle emissions resulting from increased traffic associated with indirect development throughout the region," (2) "stationary source emissions from establishments that are anticipated to be built in the region," (3) "construction related emissions," and (4) "ambient air quality contaminants from facilities and activities in the vicinity of the project site." Report of Air Quality Impact Assessment, Soil & Materials Engineers, Inc. at i (July 11, 2003), *reprinted in* EA Supplement, *supra*, at app. BB, J.A. 1105 ("SME Supplementary Report").

SME employed the same methodology in the revised analysis as it did in its original examination, using carbon

monoxide as a predictive tool for meeting the then-existing National Ambient Air Quality Standards ("NAAQS") under the Clean Air Act ("CAA"). Since carbon monoxide is more likely than the other relevant contaminants (*e.g.*, particulate matter, nitrogen oxide, and hydrocarbons) to impact air quality, a finding of *de minimis* carbon monoxide impact would indicate that the other criteria air pollutants would likely be in compliance. Based on SME's updated study, BIA confirmed that "[c]arbon monoxide and other NAAQS criteria air pollutants expected to be produce[d] by the indirect effects from the Project indicates that those air pollutants will be in compliance with [then-existing] NAAQS standards." EA Supplement, *supra*, at 48, J.A. 825. In addition, SME concluded that since ozone, hydrocarbons, and nitrogen oxide are "regional in nature[,] . . . . meaningful evaluation" of their effects "on a project-by-project basis is not practical." SME Supplementary Report, *supra*, at 8, J.A. 1113.

In both its EA and EA Supplement, the Bureau continued to evaluate air quality impact based in part on EPA's then-existing more lenient 1-hour ozone standard. Under that standard, Berrien County was considered an area of "attainment" – *i.e.*, in compliance with the CAA. While EPA had promulgated a more rigorous 8-hour standard in 1997 that put Berrien County's attainment status in jeopardy, *see* National Ambient Air Quality Standards for Ozone, 62 Fed. Reg. 38,856 (July 18, 1997) (codified at 40 C.F.R. § 50.10 (2005)), on-going litigation left its implementation in doubt at the time the EA was produced. *See Am. Trucking Ass'ns v. EPA*, 283 F.3d 355 (D.C. Cir. 2002) ("*Am. Trucking I*"); *Am. Trucking Ass'ns v. EPA*, 175 F.3d 1027, *reh'g granted in part and denied in part*, 195 F.3d 4 (D.C. Cir. 1999), *rev'd in part sub nom. Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001) ("*Am. Trucking II*"). In addition, while EPA's 8-hour standard was upheld in 2002, *Am. Trucking I*, 283 F.3d at 379, Berrien County was not designated "nonattainment" until June 15, 2004. *See* Air Quality Designations and

Classifications for the 8-Hour Ozone National Ambient Air Quality Standards, 69 Fed. Reg. 23,858, 23,910 (Apr. 30, 2004) (to be codified at 40 C.F.R. pt. 81) ("8-Hour Standards"), which was almost a year after SME's second study was completed.

The Bureau suggested, however, that in the event that Berrien County became designated an area of nonattainment prior to project construction, "a General Conformity Analysis would be required." EA, *supra*, at 25, J.A. 337. A conformity analysis, which is required by the CAA for federal actions within nonattainment and maintenance areas, must demonstrate how the actions conform to the existing State Implementation Plan to remedy the air pollution problem. *See* 42 U.S.C. § 7506(c) (2000).

On November 20, 2003, based upon the analysis in the EA and the EA Supplement, BIA issued a Revised FONSI, in which it renewed its position that implementation of the proposed action would have no significant impact on the human environment and that an EIS was not required. Following this issuance, Interior filed a renewed motion for summary judgment and relief from the temporary injunction imposed by the District Court. On March 24, 2005, the District Court issued an order finding that Interior had "fully complied" with NEPA, and granted its summary judgment motion and lifted the temporary injunction. *TOMAC III*, 2005 WL 2375171, at *1. In granting summary judgment for Interior, the District Court rejected TOMAC's claims that BIA had failed to provide an adequate opportunity for public comment, *id.* at *2, and held that BIA adequately addressed the impact of the project on air quality and local water and sewer systems, as well as the "cumulative impacts" of the gaming resort. *Id.* at *2-5.

TOMAC now appeals the District Court's successive grants of summary judgment to Interior. In turn, Interior and intervenors renew their claims that TOMAC lacks standing.

## II.  ANALYSIS

We note at the outset that we agree with the District Court's finding that TOMAC has Article III and prudential standing to challenge BIA's actions under both NEPA and IGRA.  *See Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 492 (1998) (prudential standing); *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 672 (D.C. Cir. 1996) (en banc) (NEPA); *Humane Soc'y of the U.S. v. Hodel*, 840 F.2d 45, 53-59 (D.C. Cir. 1988) (germaneness).  There is no serious question about TOMAC's standing that warrants further discussion by this court.

Our review of the District Court's grants of summary judgment is *de novo*.  *George v. Leavitt*, 407 F.3d 405, 410 (D.C. Cir. 2005).

### A.  *Environmental Assessments*

The court's role in reviewing an agency's decision not to issue an EIS is a "limited" one, designed primarily to ensure "that no arguably significant consequences have been ignored." *Pub. Citizen v. Nat'l Highway Traffic Safety Admin.*, 848 F.2d 256, 267 (D.C. Cir. 1988).  The evaluation of the "'impact' of those consequences on the 'quality of the human environment,' . . . is 'left to the judgment of the agency.'"  *Id.* (quoting *Sierra Club v. DOT*, 753 F.2d 120, 128 (D.C. Cir. 1985)).  This court will overturn an agency's decision to issue a FONSI – and therefore not to prepare an EIS – only "if the decision was arbitrary, capricious, or an abuse of discretion."  *Sierra Club v. Peterson*, 717 F.2d 1409, 1413 (D.C. Cir. 1983).  When examining a FONSI, our job is to determine whether the agency: (1) has "'accurately identified the relevant environmental concern,'" (2) has taken a "'hard look'" at the problem in preparing its EA, (3) is able to make a convincing case for its finding of no significant impact, and (4) has shown that even if there is an impact of true significance, an EIS is unnecessary

because "'changes or safeguards in the project sufficiently reduce the impact to a minimum.'" *Town of Cave Creek v. FAA*, 325 F.3d 320, 327 (D.C. Cir. 2003) (quoting *Sierra Club v. DOT*, 753 F.2d at 127).

### 1. *Public Comment*

Before attacking the substance of the EA, TOMAC argues that BIA's decision not to afford an additional round of public comment following the District Court's remand precludes this court from finding the Bureau's ultimate action reasonable. TOMAC asserts that CEQ regulations encourage public involvement when preparing an EA, and points to BIA's own NEPA handbook which states that the public should have "meaningful opportunities" for participation in BIA actions that significantly affect them.

As an initial matter, we note that the binding effect of CEQ regulations is far from clear. *See City of Alexandria v. Slater*, 198 F.3d 862, 866 n.3 (D.C. Cir. 1999) (stating that CEQ "has no express regulatory authority under [NEPA]," as it was only empowered to issue "binding" regulations by presidential executive order). *But see Andrus v. Sierra Club*, 442 U.S. 347, 358 (1979) (noting that the CEQ's NEPA interpretations are entitled to "substantial deference"). Even so, nothing in the CEQ regulations suggests that another comment round is necessary following an agency's issuance of a supplemental EA. And two of our sister Circuits have found that public input during the EA process is not required. *See Alliance to Protect Nantucket Sound, Inc. v. U.S. Dep't of the Army*, 398 F.3d 105, 115 (1st Cir. 2005); *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1279 (10th Cir. 2004). In rejecting a party's call for an EIS, the Tenth Circuit noted that "NEPA's public involvement requirements are not as well defined when an agency prepares only an EA and not an EIS." *Greater Yellowstone Coal.*, 359 F.3d at 1279. The Tenth Circuit found significant the comparison between 40 C.F.R. §§ 1503.1 and

1503.4, which require agencies preparing an EIS to make an initial draft available for public comment, and § 1501.4(b), which only obligates agencies to "involve . . . the public, to the extent practicable, in preparing [EAs]," and § 1501.4(e)(2), which requires agencies to make a FONSI available for public review prior to their final decision only in specific circumstances that are not applicable here. *Id.* At a minimum, this suggests that the agency has significant discretion in determining when public comment is required with respect to EAs.

The record here indicates that BIA sought comment on the original draft EA and provided detailed responses to comments it received. The EA Supplement merely amplified the issues that had been addressed in BIA's original 2001 EA, so the agency reasonably concluded that further public comment was unnecessary. On this record, we find no merit in TOMAC's claim that another round of public comment was required. BIA acted appropriately given the prior public involvement, and no statute or regulation requires anything more.

### 2. *Size of the Project and Report*

In contending that an EIS is in order, TOMAC first argues that the sheer magnitude of the proposed gaming resort, as well as the length and complexity of the resulting EA, indicates that an EIS is necessary. In terms of the project's size, TOMAC avers that the anticipated arrival of 4.5 million visitors a year to a rural community of less than 5,000 residents suggests that BIA should produce an EIS. Similarly, TOMAC claims that because BIA spent four-and-a-half years and generated almost 900 pages of data and analysis examining the potential environmental impacts of the proposed gaming resort, it is clear that an EIS is needed. These claims miss their mark.

TOMAC offers no support for the proposition that an EIS is *required* when a project reaches a certain size. The relevant

benchmark is whether the federal action "significantly affect[s] the quality of the human environment." 42 U.S.C. § 4332(2)(C). Large federal projects may, on the average, be more likely to meet this threshold. But there is no categorical rule that sizable federal undertakings *always* have a significant effect on the quality of the human environment.

Similarly, the significant time and effort BIA has spent preparing its EA does not alone prove that an EIS is obligatory. TOMAC relies on the CEQ guidelines, which advise that an EA should be no more than 10-15 pages in length. Br. of Plaintiff-Appellant at 26 (citing *Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations*, 46 Fed. Reg. 18,026 (Mar. 23, 1981)). This guideline is not a binding regulation, however. *See Davis v. Mineta*, 302 F.3d 1104, 1125 n.17 (10th Cir. 2002). The simple point here is that the length of an EA has no bearing on the necessity of an EIS. *See Sierra Club v. Marsh*, 769 F.2d 868, 875 (1st Cir. 1985) ("EA length, complexity, and controversy . . . . do not by themselves show that the EAs' conclusion – 'no significant impact' – is correct, nor do they show it is incorrect."). "What ultimately determines whether an EIS rather than an EA is required is the scope of the project itself, not the length of the agency's report." *Heartwood, Inc. v. U.S. Forest Serv.*, 380 F.3d 428, 434 (8th Cir. 2004). The opposite regime would create perverse incentives for agencies, as it would only serve to "encourage agencies to produce bare-bones EA's." *Id.*

3. *Impact on Air Quality*

As for the substance of BIA's NEPA analysis, TOMAC focuses its complaint on BIA's decision not to address in detail the gaming resort's potential impact on air quality under the impending 8-hour ozone NAAQS. TOMAC contends, and BIA concedes, that the agency was aware at the time of the preparation of its EA and EA Supplement that Berrien County was likely to move from attainment to nonattainment under the

CAA. *See* EA, *supra*, at 25, J.A. 337. TOMAC argues that the agency's failure to act on this knowledge contradicts the District Court's finding that BIA took the requisite "hard look" at the environmental impact, undermines BIA's FONSI, and should result in a court-ordered EIS.

This claim fails, however, because Berrien County's nonattainment designation was made long after the EA and EA Supplement were completed. The EA was released in January 2001 and the EA Supplement was completed in August 2003. Berrien County was not designated nonattainment, however, until June 15, 2004. *See* 8-Hour Standards, 69 Fed. Reg. at 23,910. TOMAC points to nothing in NEPA itself or its implementing regulations that suggests that a supplement to an EA or FONSI is required when new information *potentially* affecting the federal action in question is released. Supplementation is only required under NEPA implementing regulations in the context of an EIS. *See* 40 C.F.R. § 1502.9(c)(1)(ii) (2005) (stating that agencies "[s]hall prepare supplements to either draft or final environmental impact statements if . . . . [t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts"). Furthermore, TOMAC does not assert that the construction of the facility *itself* would push the area into nonattainment. *See* 40 C.F.R. § 1508.27(b)(10). Therefore, even if we were to import § 1502.9(c)(1)(ii)'s requirement into the EA context, it is not clear that a pre-project nonattainment designation qualifies as a "significant new circumstance" for the purposes of determining the project's *effect* on the area's air quality.

As the District Court noted, "reassessments must end at some point, or NEPA simply becomes a tool to stall new projects indefinitely, 'render[ing] agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made.'"

*TOMAC III*, 2005 WL 2375171, at \*4 (quoting *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 373 (1989)) (alteration in *TOMAC III*). BIA undertook an extensive analysis of the air quality impacts likely to occur based on the regime with which it was faced, which is all that can reasonably be expected.

It is also noteworthy that BIA's failure to address potential nonattainment in the EA and EA Supplement does not mean that the post-analysis nonattainment designation will go unexamined. The CAA, and not NEPA, is the primary force guiding states and localities into NAAQS compliance. As intervenors note, under the CAA, the State of Michigan is required to comply with EPA regulations governing attainment status. A nonattainment designation will likely require the State's own assessment – a "conformity analysis" – of how Berrien County will gain compliance. *See* 42 U.S.C. § 7506(c).

The other pieces of BIA's air quality analysis are thorough and reasonably conducted. The Bureau's choice to model primarily for carbon monoxide was reasonable, given that carbon monoxide is the most likely priority pollutant to have a significant impact on air quality. EPA also concurred with BIA's use of carbon monoxide as a screening tool. *See* Public Comment Period & Responses to Comments at 15, EA, *supra*, at app. U, J.A. 627.

Finally, there is nothing to indicate that BIA's approach to non-carbon monoxide impacts was other than sensible. The Bureau concluded that "[d]ue to the regional nature of ozone, hydrocarbon, and nitrogen oxide air quality concerns, meaningful evaluation of these pollutants on a project-by-project basis is not practical." EA Supplement, *supra*, at 48, J.A. 825. Ozone close to ground level, for example, "can be transported long distances . . . impacting air quality downwind of the area of formation." SME Supplementary Report, *supra*, at 8, J.A. 1113. In this case, given that most of the ozone in western Michigan is attributable to transportation impacts from upwind cities such

as Gary, Chicago, and Milwaukee, BIA reasonably determined that the traffic augmentation in Berrien County would not significantly contribute to ozone levels in the area.

The Bureau's thorough analysis of the conditions existing at the time of its examinations demonstrates clearly that it took a "hard look" at the project's potential direct and indirect impacts on local air quality. BIA was under no obligation to hypothesize about future regulations. The agency's handling of the gaming resort's potential impact on air quality was neither arbitrary and capricious, nor an abuse of its discretion.

4. *Cumulative Impacts*

TOMAC next asserts that BIA's EA Supplement ignores the "cumulative impacts" of the gaming resort. NEPA's implementing regulations require an agency to evaluate "cumulative impacts" along with the direct and indirect impacts of a proposed action. *See Grand Canyon Trust v. FAA*, 290 F.3d 339, 341, 345 (D.C. Cir. 2002). A "cumulative impact" is "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . undertakes such other actions." 40 C.F.R. § 1508.7. We have held that a "meaningful cumulative impact analysis must identify" five things: "(1) the area in which the effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions – past, present, and proposed, and reasonably foreseeable – that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate." *Grand Canyon Trust*, 290 F.3d at 345 (quotation and citation omitted). In other words, the agency "cannot treat the identified environmental concern in a vacuum." *Id.* at 346.

Appellant appears to misunderstand the function of a cumulative impacts analysis. TOMAC construes the requirement to mean that BIA was required to consider the "cumulative impact of all the casino's expected impacts when added together." Br. of Plaintiff-Appellant at 43. This is not correct. The "cumulative" impacts to which the regulation refers are those *outside* of the project in question; it is a measurement of the effect of the current project along with any other past, present, or likely future actions in the same geographic area. *See* 40 C.F.R. § 1508.7.

The Bureau discusses one identifiable "future action" in its EA Supplement – the potential for new business development on a particular parcel of land as a result of the casino. *See* EA Supplement, *supra*, at 51, J.A. 828. It found that the zoning ordinances of the local governments, as well as taps to the sewer and water system, were sufficient to account for the "cumulative impact." *Id.* BIA concluded its cumulative impacts statement by declaring that "no past, present, or reasonably foreseeable future actions are known or anticipated which might produce a significant cumulative impact when considered with the added incremental impact of the Project." *Id.* at 53, J.A. 830.

Other than the potential for development on the one parcel of land, the Bureau notes that no projects are "known or anticipated" to combine to produce a significant negative impact on the environment. And TOMAC points to nothing to suggest that BIA overlooked anything. Therefore, we find that BIA's cumulative impacts analysis is sufficient for purposes of NEPA.

### B. *"Restored" to Federal Recognition*

TOMAC's principal claim is that BIA and the District Court improperly concluded that the Pokagon Band was a "restored" tribe under § 20 of IGRA. The Tribe's designation as "restored" facilitated BIA's ability to more easily take the Pokagon Band's land into trust. We agree with BIA and the District Court that

the language of the statute and the legislative history of the Restoration Act clearly demonstrate that the Pokagon Band is a "restored" tribe within the meaning of IGRA.

In 1988, Congress enacted IGRA, in large part to "provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." 25 U.S.C. § 2702(1); *see Diamond Game Enters., Inc. v. Reno*, 230 F.3d 365, 366-67 (D.C. Cir. 2000). Section 20 of IGRA generally provides that regulated Indian gaming is prohibited on off-reservation lands acquired in trust by the United States after October 17, 1988. *See* 25 U.S.C. § 2719(a). A tribe may be exempted from this prohibition if the Secretary, after local consultation, determines that a gaming establishment "would be in the best interest of the Indian tribe . . . and would not be detrimental to the surrounding community," and the state Governor approves the plan. 25 U.S.C. § 2719(b)(1)(A). Alternatively, the "restored lands exception" eliminates the aforementioned procedural hurdles where the land in question is taken into trust as part of "the restoration of lands for an Indian tribe that is restored to Federal recognition." 25 U.S.C. § 2719(b)(1)(B)(iii). In the case of the Pokagon Band, the Bureau determined, and the District Court agreed, that the Band was "restored to Federal recognition" within the meaning of 25 U.S.C. § 2719(b)(1)(B)(iii).

Section 2 of the Restoration Act states: "Federal recognition of the Pokagon Band of Potawatomi Indians is hereby affirmed." 25 U.S.C. § 1300j-1. TOMAC contends that Congress purposefully used "affirmed" instead of "restored" to ensure that IGRA's restored lands exception did not apply to the Pokagon Band. In addition to offering no support in the record for this claim, TOMAC's contention overlooks the language of the statute as a whole, disregards similar language in related

statutes, and fails to account for the recognized history of the Pokagon Band.

As noted above, the Pokagon Band "was unfairly terminated as a result of both faulty and inconsistent administrative decisions contrary to the intent of the Congress, federal Indian law and the trust responsibility of the United States." S. REP. NO. 103-266, at 6. To remedy this injustice, Congress enacted the Restoration Act in 1994. The Act's specific purpose was to reestablish the Tribe's status as a federally recognized tribe, 25 U.S.C. § 1300j-1, thus bringing the Tribe within the umbrella of federal services and benefits extended to other federally recognized tribes, 25 U.S.C. § 1300j-2.

While IGRA offers no definition of "restore," the common use of the term is "to put back into a former or proper position." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1936 (3d ed. 1993). Congress's enactment of the Restoration Act did both with respect to the Pokagon Band. The House and Senate committee reports, as well as the statute itself, make clear that the Band's "proper" place is one of federal recognition. The Restoration Act also put the Band back into its "former" place as a recognized tribe. The Senate committee report explicitly states that while Congress was not responsible for the Tribe's termination, it was nevertheless "terminated" for all intents and purposes due to "faulty and inconsistent administrative decisions." S. REP. NO. 103-266, at 6; *see also Grand Traverse Band of Ottawa & Chippewa Indians v. Office of U.S. Atty. for W. Dist. of Mich.*, 369 F.3d 960, 970 (6th Cir. 2004). The Restoration Act clearly remedied that improper termination and "restored" the Band to its rightful place.

Even more plainly, the Restoration Act explicitly states that it is "An Act to *restore* Federal services to the Pokagon Band of Potawatomi Indians," Pub. L. No. 103-323, 108 Stat. 2152 (codified at 25 U.S.C. § 1300j) (emphasis added). And the

Senate committee report describing the purposes of the act states: "The [Pokagon] Band's claim of rights and status as a treaty-based tribe, and the need to *restore* and clarify that status, has been clearly demonstrated." S. REP. NO. 103-266 at 6 (emphasis added).

Finally, other decisions in related cases clearly support the District Court's judgment in this case. For example, 25 U.S.C. § 1300k-2 (2000) states: "Federal recognition of the Little Traverse Bay Bands of Odawa Indians and the Little River Band of Ottawa Indians is hereby *reaffirmed*" (emphasis added). The Sixth Circuit noted that the statute apparently restored federal recognition to these Bands. *See Sault Ste. Marie Tribe of Chippewa Indians v. United States*, 288 F.3d 910, 912 & n.2 (6th Cir. 2002). Likewise, 25 U.S.C. § 1300*l*(a) (2000), a statute restoring the Auburn Indians to federal recognition, states: "Federal recognition is hereby *extended* to the Tribe" (emphasis added). We read this statutory language to signify that "Congress *restored* the Auburn Band's rights as a federally recognized tribe in 1994." *City of Roseville v. Norton*, 348 F.3d 1020, 1022 (D.C. Cir. 2003) (emphasis added).

There can be no real doubt here that the Restoration Act restored the Tribe to federal recognition for the purposes of § 20 of IGRA. We therefore affirm the District Court's grant of summary judgment to BIA on this issue.

**C.** ***The Lawfulness of Congress's Delegation Under the Restoration Act***

In a final attempt to derail the Pokagon Band's pursuit of its gaming resort, TOMAC argues that § 6 of the Restoration Act, 25 U.S.C. § 1300j-5, constitutes an unlawful delegation of power from Congress to the Secretary. That section provides:

> The Band's tribal land shall consist of all real property, including the land upon which the Tribal Hall is situated, now or on and after September 21, 1994, held by, or in trust

for, the Band. The Secretary shall acquire real property for the Band. Any such real property shall be taken by the Secretary in the name of the United States in trust for the benefit of the Band and shall become part of the Band's reservation.

25 U.S.C. § 1300j-5. TOMAC contends that the Secretary's authority is boundless, because the statute allows her to acquire land for the tribe without constraint. This is a specious argument. When § 1300j-5 is read in light of its clear purpose, the history of the Tribe, and the Restoration Act as a whole, it is clear that Congress set forth appropriate boundaries to guide the Secretary in her acquisition of land in trust for the Tribe.

In a nondelegation challenge, the test is whether Congress has set forth "'an intelligible principle to which the person or body authorized to [act] is directed to conform.'" *Am. Trucking II*, 531 U.S. at 472 (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)) (alteration in *Am. Trucking II*). The Supreme Court has explained that the general policy and boundaries of a delegation "need not be tested in isolation." *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 104 (1946). Instead, the statutory language may derive content from the "purpose of the Act, its factual background and the statutory context in which they appear." *Id.*

The trust acquisition direction in § 1300j-5 must be read as an integral part of the Restoration Act, in light of the history of the relationship between the United States and the Tribe, and the Restoration Act's express purposes as a whole. The Restoration Act reestablishes the Pokagon Band as a federally recognized Indian tribe and its primary purpose is to allow the Tribe to restore its land base – a reservation – and to exercise jurisdiction on that reservation. *See* 25 U.S.C. §§ 1300j-5, j-7. The Tribe has existed in the St. Joseph River Valley in southwestern Michigan and northern Indiana since at least the early 1600s. The statute restores federal services to the Tribe within a

10-county service area that corresponds to the Tribe's ancestral home. 25 U.S.C. § 1300j-6. We categorically reject the suggestion that the Secretary has been given no direction as to where she is to take land into trust for the Tribe. It is obvious here that the Secretary's delegated authority under § 1300j-5 is cabined by "intelligible principles" delineating both the area in and the purpose for which the land should be purchased. We therefore find that Congress's delegation to the agency was lawful.

### III. CONCLUSION

For the reasons discussed above, the judgments of the District Court are hereby affirmed.

*So ordered.*